# IN THE SUPREME COURT OF IOWA

No. 17–1989

Filed May 24, 2019

**STATE OF IOWA,**

> Appellee,

vs.

**ANTOINE TYREE WILLIAMS,**

> Appellant.

---

Appeal from the Iowa District Court for Floyd County, Rustin T. Davenport, Judge.

The defendant appeals his conviction for second-degree murder, challenging the jury pool and raising several other claims of error. **AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven and Coleman J. McAllister, Assistant Attorneys General, and Rachel A. Ginbey, County Attorney, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This is the third case we decide today concerning a defendant's right to an impartial jury drawn from a fair cross section of the community. An African-American defendant was charged with first-degree murder in Floyd County, a county that is approximately 2.3% African-American in population. *See* Iowa Code §§ 707.1, .2(1)(*a*) (2017). The decedent was also African-American. The jury pool of unexcused jurors, however, contained only one African-American. The district court overruled the defendant's motion to strike the jury panel. Later, the court declined to permit defense counsel to individually voir dire the prospective jurors on a sequestered basis concerning their racial attitudes. During trial, the court also refused to admit into evidence the decedent's prior criminal record or other bad acts unless the defendant knew about them. Further, the court declined to give the defendant's proposed implicit-bias instruction, noting that it had not been previously reviewed by an Iowa court and that its subject matter was essentially covered by the latest version of an instruction promulgated by the Iowa State Bar Association. Lastly, the court did not allow the defendant to assert a "stand your ground" defense because it had not become effective until after the alleged murder had been committed. The jury found the defendant guilty of second-degree murder. *See id.* § 707.2.

On appeal, we find that the district court's voir dire ruling and its decision not to give the implicit-bias instruction were within the court's discretion. We also agree with the district court that when asserting self-defense, the defendant generally may not offer proof of prior bad acts not known to the defendant as a way of proving the allegedly aggressive character of the other party. And we agree that the stand your ground

defense does not apply to crimes committed before that law took effect. However, we believe further consideration of the defendant's fair-cross-section claim is warranted in light of the decisions we are filing today in *State v. Lilly*, ___ N.W.2d ___, ___ (Iowa 2019), and *State v. Veal*, ___ N.W.2d ___, ___ (Iowa 2019). Therefore, we conditionally affirm the defendant's conviction and sentence while remanding for further proceedings consistent with *Lilly*, *Veal*, and this opinion.

## II. Facts and Procedural History.

Late in the day on June 30, 2017, Shaun Biehl and his ex-girlfriend Jocelyn Simmons were spending time at her apartment in the Clarkview Apartments in Charles City. Biehl and Simmons were no longer in a romantic relationship but remained friends. Their four-year-old daughter also lived in the apartment. While Biehl was there, Nate Fleming dropped in several times. Fleming was a relatively small man who weighed 146 pounds and was five feet, seven inches tall. According to Biehl, Fleming was not upset or angry when he came by. Both Biehl and Simmons were also familiar with Antoine Williams, another resident of the Clarkview Apartments. Williams was a large man who weighed approximately 300 pounds and was six feet, seven inches tall.

Around 8:10 p.m., Biehl put his and Simmons's daughter to bed. Biehl and Simmons sat down to watch television. After watching a full episode of a show, Biehl remembers hearing two gunshots outside and running to a window that overlooked the Clarkview Apartments parking lot. Biehl saw Williams standing outside Fleming's red Chevy Equinox with his arm extended into the open driver's side door. Biehl heard two more shots and saw muzzle flashes. He then saw Williams pull Fleming's body out of the vehicle, throw him on the ground, get in the truck, and drive off.

Biehl called 911 on his cellphone and rushed outside to try to render assistance. Others also came to the scene. Fleming was on his back, bleeding with bullet wounds in his chest area, and gasping for air. Meanwhile, Biehl spotted Williams driving back toward the group in the Equinox. Biehl told everyone to run and ran himself. Williams sped past the group in his vehicle and continued out of the complex. Fleming died at the scene.

Simmons likewise recalled being with Biehl at the apartment the evening of June 30. Fleming came by a couple of times to see her, and he was not upset or angry, although he smelled of alcohol. Simmons also remembered hearing shots and rushing to the window after their daughter had been put to bed. The first thing she saw was Williams holding a gun and standing over Fleming's body. After that, she saw Williams get into the red Chevy Equinox and drive away. Simmons too ran outside, and observed Fleming lying on the ground bleeding and then losing consciousness. She put a pillow under his head.

Christopher Vierkant, who was familiar with Williams, lived next door to the Clarkview Apartments. On the evening of June 30, around 8:30 or 9:00 p.m., Vierkant was outside with his children. He saw Williams walk past and said hello to him. According to Vierkant, Williams was focused on a red car that he was walking toward. Vierkant saw an African-American man in the red car with his hands on the wheel but could not see the man's face. Vierkant did not hear any talking or arguing between Williams and the man in the red car. He then saw two flashes and heard two bangs. At the time, he thought these were just fireworks. Vierkant ran back outside later after the police arrived at the apartment complex.

After the police arrived, they found two .380 caliber shell casings on the ground at the scene. They were also later able to track down the

abandoned red Equinox, but Williams had moved on to Chicago, Illinois. On July 5, Williams was arrested there. On July 7, Williams was interviewed in Chicago by a special agent with the Iowa Division of Criminal Investigation. When asked about the evening of June 30, Williams initially claimed that he had hung out with a group that included Fleming and then gone over to an ex-girlfriend's apartment and stayed there for the night. Williams claimed he did not learn until several days later that Fleming had been shot. Williams steadfastly denied having anything to do with Fleming's death, saying, "No, sir, that's crazy."

Later, questioning became more pointed. Williams was asked, "Do you think that law enforcement knows that you were involved in -- in [Fleming's] death?" Williams acknowledged at that point that he had shot Fleming in the parking lot of the Clarkview Apartments. He said that he had been approaching the Chevy Equinox when Fleming "said something that triggered him." Williams said he was standing a few feet from the open window of the car when he shot Fleming. He shot "however many bullets he had in his gun." Williams also admitted he "never saw [Fleming] with a gun that night."

Williams admitted that after he shot Fleming, he opened the car door, pulled Fleming out, and got into the vehicle and drove away. Williams said that he later broke Fleming's cellphone into pieces and threw them away. He also retrieved two shell casings from the car and discarded the gun he had used to shoot Fleming. Williams said he had purchased the gun from Ed Brown and had kept it under the sink in his apartment.

Williams went on with this version of events. He claimed that earlier that evening of June 30, when Fleming, Williams, and others were hanging out at the apartment complex, Fleming had questioned the group whether they had something to do with a beating Fleming had recently received.

Before Fleming left in his vehicle, he allegedly told others in the group, "You better not be standing here when I get back." Williams told the investigator he went to retrieve his gun after Fleming left. Williams added that he should have let the matter go. As Williams put it, "I did it, I did it, and I shouldn't have done it."

Williams did not claim in the interview that he had acted in self-defense. To the contrary, he said, "[I]t's on me. That's on me."

An autopsy report determined that Fleming died from multiple gunshot wounds. Fleming's body contained six gunshot wounds, which were caused by between four and six bullets. Four bullets were recovered from Fleming's body. One of the wounds had gunpowder stippling, which meant that the gun had been discharged within eighteen inches of Fleming's body. Fleming's blood alcohol concentration at the time of his death was .242.

On July 19, a trial information was filed in the Iowa District Court for Floyd County, charging Williams with first-degree murder. *See* Iowa Code §§ 707.1, .2(1)(*a*). On August 24, Williams moved to change the venue from Floyd County. On September 11, the district court denied the motion, indicating that the majority of the media articles had been factual and that it did not believe prospective jurors would have a predisposition about the case. The court did instruct the clerk, however, to bring in an additional jury panel to ensure there would be sufficient numbers from which to select a jury. On September 18, Williams filed a notice that he intended to rely on the defense of self-defense/justification at trial. *See id.* § 704; Iowa R. Crim. P. 2.11(11)(*c*).

Trial was scheduled to begin October 10. On October 2, Williams, who is African-American, filed a motion to challenge the jury panel. Williams's motion noted that African-Americans represent 2.3% of the

Floyd County population according to the 2016 census, yet only two of the 166 potential jurors who submitted questionnaire responses for two jury pools for October through December 2017 self-identified as African-American. (One of these two had been excused.) Williams also reported tallies for the last four years:

> In the calculations overall in the [last] four years, there were 1,404 jurors, of which, 452 did not respond to the race question. Of the 952 remaining jurors, in this four-year span, only 9 members reported being African American, which would be only 0.9% of the jurors pooled from 2013 through 2017.

On October 3, the State filed a resistance to Williams's motion. The State acknowledged that the most recent census data showed that 2.3% of the population in Floyd County was Black or African-American, but argued this figure should not be used for comparisons because the African-American population was disproportionately younger and 2.3% did not reflect the percentage actually eligible for jury service. The State also urged the data on which Williams relied were flawed because they did not account for jurors who declined to disclose their race on their questionnaire responses. The State thus insisted that Williams had not proved substantial underrepresentation or systematic exclusion under the three-part *Duren/Plain* standard. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979); *State v. Plain*, 898 N.W.2d 801, 822 (Iowa 2017).

On October 5, the district court held a hearing on pretrial motions at which it received exhibits and heard argument on the motion to strike the jury panel. On October 6, the district court entered a written ruling denying Williams's motion to challenge the jury panel. The court found that Williams failed to show a violation of his Sixth Amendment rights

under the second and third prongs of the *Duren/Plain* test. The court noted,

> Turning to the panels available for the defendant's trial the Court required the clerk to call in two separate pools. According to Exhibit D, the last two pages, there were 103 letters sent to potential jurors in Pool 1 and 103 letters sent to potential jurors in Pool 2. Twelve letters were either undelivered or did not respond as to Pool 1. Thus there were 91 responses in Pool 1. In Pool 2 there were five that were undelivered or failed to respond. There were 98 responses in Pool 2.

> In Pool [1] there are 23 potential jurors who did not identify their ethnicity. The 23 number is derived from adding the three who responded, the nine who were excused, and the ten who were disqualified, and the one who was deferred. Subtracting 23 from 91 results in 68 potential jurors who responded and self-identified their ethnicity. In Pool 2, of the 98 responses, 28 responses did not self-identify their ethnicity (six responding, 14 excused, six disqualified, and two deferred). Subtracting 28 from 98 results in 70 potential jurors who responded and self-identified their ethnicity.

> Combining the two pools results in 138 individuals who responded to their summons and who self-identified their ethnicity. Exhibit D demonstrates that there is one self-identified African-American who was excused from the jury. The Court understands that the reason for the excusal is because the individual was attending college away from home. Panel 2 has one person [who] identified as African-American.

> If the jury pool was proportional to the population, out of 138 jurors, there should be two to three potential jurors who are African-American. If the Court accepts the defendant's figure of 2.3 percent, then the number of expected African-American jurors in the pool should be at least three jurors.

The district court went on to reject Williams's argument that the excused African-American juror could not be considered because "there is no showing that the method of excusing jurors is such that African-Americans are excused in greater numbers than other persons of different ethnicity or nationality." The court then found no underrepresentation because given the small numbers involved, "it is difficult to apply a rigid

statistical analysis to the matter." The court also held there was no showing of systematic exclusion of African-Americans from the potential jury pool. It noted, however,

> In reviewing historical numbers, the Court believes that the state court system can do more and the Court suspects that a more through statistical analysis would show that African-Americans are less likely to have motor vehicle registration or are less likely to be registered to vote. However, that showing has not been made in this case. The Court believes that additional lists could be used to increase the potential numbers of distinct minority groups. However, while believing there may be better ways to select potential jurors, this does not mean that the current method systematically excludes African-American jurors. The State attempts to use neutral, readily-available lists. Defendant's position does not address potential other reasons for the potential underrepresentation of African-Americans on the historical jury pools. There is not sufficient showing that a systematic exclusion resulted from something that the State has done.

Trial began as scheduled on October 10. Two days earlier, Williams had moved for individualized voir dire by counsel "so that the Defendant can effectively and adequately exercise his peremptory challenges in selecting jurors." For most of the day of the 10th, the court, the prosecution, and the defense conducted voir dire, and a number of prospective jurors were excused. In the afternoon, the defense approached the court and specifically requested taking each of the thirty-four prospective jurors in the box for a private interview to talk to them about their attitudes regarding race, among other things. The State opposed the request. The district court ruled,

> THE COURT: All right. I'm going to overrule that motion. One, for the reasons stated by the State. I -- We've listened to this jury, and I think most of them have expressed an opinion that they can be fair and impartial and don't have any predisposition in -- in this matter. And just from that kind of general sampling, I don't think it's going to be necessary to have an individual examination.

The second reason is just a matter of -- of timing. Five minutes each -- and I think that's generous -- times 34 is 170 minutes, which is, you know, almost three hours. And if we take some breaks here and there for the court reporter, you know, basically we'd be using a half a day for that.

We have a shot of getting the jury selected today. I don't know if that's going to happen or not. My experience is if I have 150 people having to come back overnight, we lose some of them, there might be exposure to things that we don't want to have them exposed to. It's a lot easier if I have 14 people that I have to take care of -- and keep track of.

So I don't want to spend that time in order to -- to pick a jury, given all that; and also I -- I think it's somewhat unfair to -- to the jury members that we do that without, you know, more cause shown for doing that.

Williams's counsel proceeded to voir dire the jurors concerning racial attitudes as a group. For example, she asked, "If you're picked to be on the jury and you go back to the jury room and you hear another juror making an argument based on race, what would you do?"

During the defense case, Williams presented witnesses who testified that Fleming had a disagreeable and boastful personality and had got into an altercation earlier that month and threatened retaliation. Witnesses also testified that Fleming was driving recklessly, had tried to slap a woman, and was making threats on June 30. Witnesses also testified to Williams's peaceful disposition.

Additionally, Williams testified on his own behalf and gave a different version of events than he had provided after his arrest. According to Williams, earlier in the day on June 30, Fleming was driving recklessly through the Clarkview Apartments parking lot, acting aggressively, insulting people, and making threats. Williams claimed the threats included the use of firearms.

Williams testified he obtained the gun he used to shoot Fleming from a friend, i.e., Brown, earlier on June 30 because he was fearful of Fleming.

However, Brown denied at trial he had provided the gun to Williams. Brown said he had previously seen Williams with a gun.

Williams claimed that when he approached Fleming in the Chevy Equinox on the evening of June 30, Fleming was highly agitated and had his music on loud, and Williams was trying to calm him down. According to Williams, Fleming said to him, "Man, you know what, don't even approach my m__f__ing car," and accused him of being in association with the individuals who had recently beaten up Fleming. After some exchanges back and forth, in Williams's words, "[H]e started reaching for what I thought was a gun." At this point, Williams said he pulled the gun out of his back pocket, covered his face, and fired shots at Fleming repeatedly until the gun was empty. Williams claimed he covered his face the entire time that he was shooting Fleming, although all the shots apparently hit their mark. Williams also claimed that when he pulled Fleming out of the car, "I didn't think he was really hurt . . . ."

Even at trial, Williams admitted that he never saw a gun on Fleming's person:

> Q. Did you ever see a weapon in the car? A. I -- I don't know. I didn't check for one, though. That -- That's my answer.
>
> Q. Did you see a weapon in the car? A. I did not check for one, sir.
>
> Q. Well, did you see Mr. Fleming with a weapon? A. You're just trying to switch this on me; but no, sir.

On October 18, the jury returned a verdict finding Williams guilty of the lesser included offense of murder in the second degree. *See* Iowa Code § 707.3. On December 8, the court sentenced Williams to an indeterminate term of imprisonment of fifty years with a mandatory

seventy percent minimum. *See id.* § 707.3(2); *id.* § 902.12. Williams filed a notice of appeal, and we retained the appeal.

On appeal, Williams raises five arguments. First, he contends that he was denied his constitutional right to a jury panel drawn from a fair cross section of the community. Second, he contends the district court abused its discretion in not allowing individualized voir dire of potential jurors on race-related issues. Third, he maintains the district court erred in excluding evidence of Fleming's criminal history and prior acts of violence not known by Williams. Fourth, Williams insists that the district court erred in refusing to give his proposed jury instruction on implicit bias. Finally, Williams contends the court erred in not following the stand your ground amendment that was enacted in 2017 and became effective on July 1 of that year.

### III. Standard of Review.

We review constitutional questions de novo. *Plain*, 898 N.W.2d at 810. This includes claims of systematic exclusion of a distinctive group from a jury pool in violation of the Sixth Amendment. *See id.*

We review claims of voir dire error for an abuse of discretion. *State v. Martin*, 877 N.W.2d 859, 865 (Iowa 2016). Likewise, evidentiary rulings are reviewed for an abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). This includes rulings on the admission or exclusion of evidence regarding prior bad acts. *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014). Additionally, we review the refusal to give a cautionary jury instruction for abuse of discretion. *See Plain*, 898 N.W.2d at 811. We have described the abuse-of-discretion standard as follows:

> When assessing a district court's decision for abuse of discretion, we only reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable. Grounds or reasons are untenable if

they are "based on an erroneous application of the law or not supported by substantial evidence."

*Id.* (quoting *State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014)).

"We review rulings on questions of statutory interpretation for correction of errors at law." *State v. Childs*, 898 N.W.2d 177, 181 (2017) (quoting *State v. Iowa Dist. Ct.*, 889 N.W.2d 467, 470 (Iowa 2017)).

## IV. Fair-Cross-Section Claim.

The jury that convicted Williams had no African-Americans on it. It also appears there were no African-Americans on the October 10 panel that was seated in the courtroom and went through voir dire. Williams maintains that the jury selection process used in Floyd County violated his Sixth Amendment right to have a jury drawn from a fair cross section of the community.[1]

---

[1]Williams argues on appeal that his rights under article I, section 10 of the Iowa Constitution were also violated. His motion to strike the jury panel and his motion for new trial in the district court mentioned exclusively the Sixth Amendment. When the district court denied the motion to strike, it mentioned only the Sixth Amendment, the only legal ground Williams had raised. However, when the district court denied the motion for new trial at the time of sentencing, it said it had considered the matter "both under the Federal and the State Constitutions."

We have held that a defendant who specifically identifies only a federal constitutional claim in the trial court has not preserved a state constitutional claim. *See Veal*, ___ N.W.2d at ___; *State v. Coleman*, 890 N.W.2d 284, 286–87 (Iowa 2017); *State v. Prusha*, 874 N.W.2d 627, 630 (Iowa 2016). It is true that the district court referred to the Iowa Constitution sua sponte at the very end of trial court proceedings—i.e. in denying the motion for new trial at the time of sentencing. However, a motion for new trial is too late to raise a constitutional challenge to the jury panel. *See State v. Johnson*, 476 N.W.2d 330, 333–34 (Iowa 1991) (finding that a constitutional objection to the jury panel was waived when first asserted in a postverdict motion for new trial).

> A post-verdict motion challenging the jury panel simply comes too late to comply with the policies behind the preservation requirement. At the time of defendant's motion, the only corrective action the trial court could have taken would have been to sustain the motion for new trial and conduct a second trial in front of a second jury.

*Id.* at 334; *cf. State v. Watkins*, 463 N.W.2d 411, 412–13 (Iowa 1990) (finding no waiver when a Sixth Amendment challenge was made after the panel had been sworn). Accordingly, we hold that Williams waived any article I, section 10 challenge to the jury panel.

As noted, the district court found that Williams had failed to meet either the second or the third *Duren/Plain* prong. It observed that out of 138 individuals in the combined pool, there were only two self-identified African-Americans, but it was "difficult to apply a rigid statistical analysis to the matter" in light of "the small numbers involved." It also found no showing that a particular State practice had resulted in systematic exclusion.

In two other cases decided today, we have discussed what a defendant must prove to establish a fair-cross-section constitutional violation. *See Lilly,* ___ N.W.2d at ___; *Veal,* ___ N.W.2d at ___. As we have explained, under the second *Duren/Plain* prong, the percentage of the distinctive group in the population should be determined using the most recent available census data. *See Lilly,* ___ N.W.2d at ___; *Veal,* ___ N.W.2d at ___. These data may be adjusted to account for those who are actually eligible to serve as jurors, for example, by eliminating the population that is under eighteen and the population (if any) that is incarcerated in a state prison located in the county. *See Lilly,* ___ N.W.2d at ___; *Veal,* ___ N.W.2d at ___.

For Sixth Amendment purposes, the defendant must then show that the percentage of the group in the jury pool is less than this expected percentage by at least two standard deviations. *See Veal,* ___ N.W.2d at ___. Pools may be aggregated, so long as pools closer in time to the trial date are not omitted when earlier pools are included. *See Lilly,* ___ N.W.2d at ___; *Veal,* ___ N.W.2d at ___. The aggregation of pools can help solve the

---

Williams states in his brief that if error was not preserved "under the Iowa Constitution, . . . trial counsel was ineffective." Appellant's Br. at 30. Yet beyond making this statement, Williams has not briefed either element of ineffective assistance. *See Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S. Ct. 2052, 2064–69 (1984). We decline to consider this claim on direct appeal.

"small numbers" problem observed by the district court in its thoughtful ruling.

Once underrepresentation has been shown, the defendant must then show that some practice or practices caused the underrepresentation—i.e. the third *Duren/Plain* prong. *See Lilly*, ___ N.W.2d at ___; *Veal*, ___ N.W.2d at ___. As we have explained in *Veal*, for Sixth Amendment purposes, the practice must be something more than an item on the *Berghuis v. Smith* "laundry list." *Veal*, ___ N.W.2d at ___ (quoting *Berghuis*, 559 U.S. 314, 332, 130 S. Ct. 1382, 1395 (2010)).

To illustrate how this analysis might work, in this case one African-American juror was excused from even coming to the courthouse on October 10 because she was in college. Williams argues that she and other preexcused jurors should not be counted in determining the percentage of the distinctive group in the jury pool, making the ratio 1/130 rather than 2/138. The State and the district court viewed the matter otherwise. As the State reasons, there is no reason to omit persons who received a juror summons from the statistics, "especially in the absence of any allegation that hardship excusals are granted in patterns that contribute to underrepresentation or exclusion."

There is a potential problem with the State and the district court's position, at least under article I, section 10 of the Iowa Constitution. A policy or practice relating to excusing jurors might amount to systematic exclusion. *See Lilly*, ___ N.W.2d at ___. If a defendant wishes to try to prove that it does, the defendant should not be foreclosed from doing so by a rigid rule that calculates the pool based on who was summoned, rather than who actually appeared.[2]

---

[2]We reiterate, however, that in this case the state constitutional claim was not preserved.

In this case, the district court prepared a careful ruling based on the caselaw as it existed at the time of trial. But it did not have the benefit of today's decisions. As in *Lilly* and *Veal*, we believe the appropriate course of action is to remand to give Williams a further opportunity to develop his Sixth Amendment fair-cross-section claim using the criteria we have set forth today. *See Lilly*, ___ N.W.2d at ___; *Veal*, ___ N.W.2d at ___.

## V. Individualized Voir Dire on Racial Attitudes.

Williams next argues that he is entitled to a new trial because his attorneys were unable to conduct individualized voir dire of the potential jurors on race issues outside the presence of the other potential jurors. The weight of authority places this subject within the domain of trial court discretion, at least when the case does not have particular racial overtones. *See, e.g., United States v. Parker*, 872 F.3d 1, 7, 8 (1st Cir. 2017) ("[N]o authority exists to support Parker's theory—floated during oral argument—that if the case facts suggest the judge should voir dire on race, then only an *individual* voir dire will do."); *United States v. Hosseini*, 679 F.3d 544, 555 (7th Cir. 2012) ("[O]rdinarily, questioning jurors as a group is sufficient to satisfy the Sixth Amendment, even when the defendant belongs to a racial, ethnic, or religious minority and juror bias on one or more of these grounds might be a concern."); *People v. Harris*, 306 P.3d 1195, 1220 (Cal. 2013) (finding no abuse of discretion in denying the defendant's motion for individual sequestered voir dire on race); *Commonwealth v. Robinson*, 942 N.E.2d 980, 986 (Mass. App. Ct. 2011) (finding that individual voir dire regarding racial bias was not required because the case did not involve an alleged interracial killing, interracial rape, or sexual offense against a child by a defendant of a different race); *Smith v. State*, 977 So. 2d 1227, 1237 (Miss. Ct. App. 2008) (finding no

error in denial of the defendant's motion for sequestered voir dire on attitudes toward race).

In *State v. Windsor*, a case involving an African-American defendant and a white alleged victim, we held that

> trial courts in Iowa should make or permit counsel to make specific inquiry into racial prejudice upon proper request in similar circumstances and in any case in which a reasonable possibility exists that the verdict might be affected by racial prejudice.

316 N.W.2d 684, 686–87 (Iowa 1982). Yet we also held that "absent special circumstances of the nature delineated in *Ham* [*v. South Carolina*, 409 U.S. 524, 93 S. Ct. 848 (1973)], the inquiry may be limited to a question of the panel sufficient to call the jurors' attention to the subject and require response from any juror harboring racial bias."[3] *Id.* at 687. In *State v. Oshinbanjo*, our court of appeals followed in *Windsor*'s tracks and held that a district court did not abuse its discretion in denying "defendant's request to individually question prospective jurors out of the presence of the other jurors" on the subject of racial prejudice. 361 N.W.2d 318, 321 (Iowa Ct. App. 1984).

Williams asks us, in effect, to overrule *Windsor*. He argues that several decades have passed and there has been new scholarship on implicit bias. But Williams cites no scholarship directed to the specific issue here—namely, the effectiveness of questioning prospective jurors on race in an individual, sequestered setting as opposed to a group setting.

---

[3]*Ham*, as we explained in *Windsor*, involved a defendant who

> was a civil rights activist who alleged that local authorities had framed him on a drug charge because of his civil rights work. Thus, racial prejudice was a material issue affecting the merits of the case.

*Windsor*, 316 N.W.2d at 686.

On our review of the record, we find the district court did not abuse its discretion. The defendant and the decedent were of the same race and there is no suggestion that race played a role in the alleged crime or its investigation. Additionally, the district court balanced Williams's request against other concerns. This case had received some notoriety in this county of around 16,000 people. The district court noted that if it granted individualized voir dire, it would no longer be possible to finish jury selection that day.[4] The court worried that it would be more difficult to limit the exposure of a large group of potential jurors overnight to improper influence than to limit the exposure of a small group of actual jurors: "It's a lot easier if I have 14 people [twelve jurors and two alternates] that I have to take care of and -- keep track of." There is logic to the court's reasoning. The message that people need to act responsibly tends to be better received when those people have been given responsibility. Thus, a person who has been told she or he is an actual juror may be more prone to take the court's admonition seriously. Finally, we note that defense counsel's panel questioning on the subject of race was thoughtful and insightful.

Having said that, we emphasize that this was a murder trial where the defendant faced a very severe sentence. Defense counsel should be given considerable leeway in utilizing voir dire to eliminate potential racial bias from the jury.

## VI. Implicit-Bias Instruction.

At trial, the district court gave Jury Instruction 5, which stated in part,

> As you consider the evidence, do not be influenced by any personal sympathy, bias, prejudices or emotions. Because you are making very important decisions in this case, you are to evaluate the evidence carefully and avoid decisions

---

[4]Jury selection was completed on March 10, the first day of trial.

based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. The law demands that you return a just verdict, based solely on the evidence, your reason and common sense, and these instructions. As jurors, your sole duty is to find the truth and do justice.

However, the court denied Williams's request to give the following additional instruction:

Our system of justice depends on judges like me and jurors like you being able and willing to make careful and fair decisions. Scientists studying the way our brains work have shown that, for all of us, our first responses are often like reflexes. Just like our knee reflexes, our mental responses are quick and automatic. Even though these quick responses may not be what we consciously think, they could influence how we judge people or even how we remember or evaluate the evidence.

Scientists have taught us some ways to be more careful in our thinking that I ask you to use as you consider the evidence in this case:

Take the time you need to test what might be reflexive unconscious responses and to reflect carefully and consciously about the evidence.

- Focus on individual facts, don't jump to conclusions that may have been influenced by unintended stereotypes or associations.

- Try taking another perspective. Ask yourself if your opinion of the parties or witnesses or of the case would be different if the people participating looked different or if they belonged to a different group

- You must each reach your own conclusions about this case individually, but you should do so only after listening to and considering the opinions of the other jurors, who may have different backgrounds and perspectives from yours.

Working together will help achieve a fair result.[5]

---

[5]Achieving an Impartial Jury Project, *Toolbox*, Am. Bar Ass'n 17–20 (footnotes omitted), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/voirdire_toolchest.pdf (last modified Oct. 13, 2015).

The court noted that Williams's proposed instruction had not been reviewed by any Iowa court to its knowledge. The court also pointed out that Instruction 5 in its view covered the subject matter:

> Instruction 5 does talk about setting aside stereotypes, biases, and prejudices. I think that addresses the issue. The law -- The jury's otherwise instructed to consider what they've heard in the courtroom; and -- and if they follow those instructions, then the race of the -- of the defendant or the -- or Mr. Fleming would not be pertinent. I'm aware of the concerns; but, as I said, I think Instruction 5 addresses that matter.

Williams argues on appeal that the district court's refusal of his implicit-bias instruction amounted to reversible error.

In *Plain*, the district court declined to give a different implicit-bias instruction than the one Williams requested here. 898 N.W.2d at 816. We noted in *Plain* that denial of a cautionary instruction like an implicit-bias instruction is subject to an abuse-of-discretion standard. *Id.* We held the trial court had abused its discretion "because it erroneously believed it lacked authority from our court to give the [implicit-bias] instruction." *Id.* at 817. Yet, in the end, we found that the district court's refusal to give Plain's requested implicit-bias instruction was not prejudicial. *Id.*

In this case, unlike *Plain*, the district court did not conclude it lacked authority to give an implicit-bias instruction. Rather, it found that Instruction 5 adequately addressed the concern. Instruction 5 was based on the Iowa State Bar Association's latest version of Instruction 100.8. *See* Iowa State Bar Ass'n, Iowa Criminal Jury Instructions 100.8 (2018) (revised June 2016). The Iowa State Bar Association updated Instruction 100.8 in 2016 so that it now directs the jury to "avoid decisions based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases." *Id.* This version of Instruction 100.8 did not exist at the time of Plain's trial and was not given in *Plain*. *See Plain*, 898 N.W.2d at 839 n.14

(Waterman, J., specially concurring) (quoting from the jury instructions). It is also noteworthy that both Williams and Fleming were of the same race, unlike in *Plain* where the defendant was African-American and the complaining witness was white. *See id.* at 809 (majority opinion). Given these factors, we find the district court did not abuse its discretion in declining to give Williams's requested implicit-bias instruction.[6] This does not mean, of course, that it would have been an abuse of discretion to use Williams's requested instruction.

**VII.  Fleming's Convictions and Other Prior Bad Acts Not Known by Williams.**

At trial, Williams asserted that he shot Fleming in self-defense. In support of this claim, Williams was allowed to introduce (1) evidence of Fleming's behavior on the day of the shooting, (2) any other specific acts by Fleming known to Williams, and (3) Fleming's alleged reputation for aggressive behavior. Specifically, Williams was permitted to introduce evidence that on the evening in question, Fleming was highly intoxicated, and that he had been acting tough, voicing threats, and driving recklessly. Williams also was allowed to offer proof that Fleming—a person who was short of stature—had a "Chihuahua complex."

However, Williams was not allowed to introduce Fleming's criminal history report[7] or proof of specific prior acts of violence not known to Williams. Williams contends this was error. The State, meanwhile, responds that the district court's ruling can be sustained on several

---

[6]Notably, in *Plain*, we held that an abuse-of-discretion standard of review applied to whether an implicit-bias instruction should have been given. *See Plain*, 898 N.W.2d at 811, 816. We specifically distinguished the prior case of *Alcala v. Marriott International, Inc.*, 880 N.W.2d 699, 707–08 (Iowa 2016), which we said did not apply to "cautionary" instructions such as an implicit-bias instruction. *Id.*

[7]There was no offer of proof to make a record of what was in Fleming's criminal history, but apparently it contained a number of assault convictions.

grounds. Among other things, the State urges us to clarify the meaning of Iowa Rule of Evidence 5.405.

Iowa Rule of Evidence 5.405, concerning "Methods of proving character," states,

> *a. By reputation or opinion.* When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.

> *b. By specific instances of conduct.* When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

Before this rule was even adopted, we held in *State v. Jacoby*, "It is the rule in Iowa and the majority of jurisdictions that the quarrelsome, violent, aggressive or turbulent character of a homicide victim cannot be established by proof of specific acts." 260 N.W.2d 828, 838 (Iowa 1977).

As we explained in *Jacoby*,

> The reasons for the rule prohibiting proof of specific acts of violence appear to be at least threefold: (1) A single act may have been exceptional, unusual, and not characteristic and thus a specific act does not necessarily establish one's general character; (2) although the state is bound to foresee that the general character of the deceased may be put in issue, it cannot anticipate and prepare to rebut each and every specific act of violence; and (3) permitting proof of specific acts would multiply the issues, prolong the trial and confuse the jury.

*Id.* (quoting *Henderson v. State*, 218 S.E.2d 612, 615 (Ga. 1975)).

Then, after we had adopted rule 405 of the Iowa Rules of Evidence, which later became rule 5.405, we reaffirmed *Jacoby*. *See Klaes v. Scholl*, 375 N.W.2d 671, 675–76 (Iowa 1985). In *Klaes*, a citizen sued police officers for assaulting him. *Id.* at 672. The testimony was in conflict as to who was the aggressor. *Id.* at 673. We indicated that evidence of the

citizen's "*character* for violence" would be admissible. *Id.* at 674. Quoting the rule 405, we said that "defendants could of course have introduced evidence of [the citizen's] violent character by reputation or opinion testimony." *Id.* at 675. Yet we held it was improper for the district court to have admitted specific instances of the citizen's prior conduct. *Id.* at 675–76. We rejected the notion that character is an essential element of a claim of self-defense, stating,

> We believe, however, that in cases like this one the "issue" in question is not one of *character* but rather of *conduct.* We hold therefore the evidence of Scholl's prior conduct did not go to an essential element of self-defense as required by [rule 5.405(b)] and was not admissible.

*Id.* at 676 (citations omitted).

Three years later, however, we were confronted with the same issue in *State v. Dunson*, 433 N.W.2d 676, 677 (Iowa 1988), a criminal assault case where the defendant raised a claim of self-defense. The defendant sought to introduce evidence that shortly after the altercation in question, the alleged victim followed him and ran him over with her automobile. *Id.* at 679. We quoted rule 5.405(b) but did not address the distinction between conduct evidence and opinion or reputation evidence. *Id.* at 680–81. Nor did we comment on whether the victim's character for violence is an essential element of a self-defense claim. *Id.* We did not mention or even cite to *Klaes.* *Id.* Rather, we simply said that the evidence was "relevant" and "material" and therefore should have been admitted on that basis. *Id.*

In *State v. Fish*, the court noted that "most states with evidentiary rules similar to the Federal Rules of Evidence permit the defendant to introduce reputation and opinion evidence, but not specific acts of violence, to prove the victim's violent character." 213 P.3d 258, 268 (Ariz.

Ct. App. 2009). Citing *Dunson*, the Arizona court noted that Iowa was one of two states not to follow this approach, but it implicitly criticized *Dunson* for failing to discuss "the essential element issue." *Id.* at 269.

Uncertainty exists today as to the applicable rule in Iowa. The court of appeals decision in *State v. Shearon*, 449 N.W.2d 86 (Iowa Ct. App. 1989), illustrates this point. There the court of appeals said, "Specific instances of conduct may be used to demonstrate character when character is an essential element of a claimed defense." *Id.* at 87. Yet the court declined to take a position on whether character is an essential element of self-defense in a criminal case, stating,

> This court notes that in the context of a civil case in which it was claimed that the combative character of an alleged assault victim should have been admitted, the Iowa Supreme Court held that specific instances of the victim's conduct did not go to an essential element of the defendant's claim of self-defense. *Klaes v. Scholl*, 375 N.W.2d 671, 676 (Iowa 1985). As the State has not made an analogous argument in this case, we assume the applicability of [rule 5.405(b)] and address our attention to whether Coaklay's testimony was relevant and/or prejudicial.

*Id.* at 87 n.1. Ultimately, it found the specific-act evidence inadmissible anyway because it "would have been substantially prejudicial and would have outweighed the probative value . . . ." *Id.* at 88.

Recently, in *State v. Webster* and *State v. Einfeldt*, we upheld on *other* grounds the exclusion of specific acts evidence that had been offered to prove a homicide victim's aggressive character. *See Webster*, 865 N.W.2d 223, 243–44 (Iowa 2015); *Einfeldt*, 914 N.W.2d 773, 783–84 (Iowa 2018). Yet we did say in *Einfeldt*, "[I]f the accused asserts he or she acted in self-defense, specific instances of the victim's conduct may be used to demonstrate his or her violent or turbulent character." 914 N.W.2d at 784. The State urges that this statement, which was not necessary to our decision, misstates the law.

We conclude today that the plain text of rule 5.405 should be followed. That text allows specific-acts evidence to be used to prove character only when character is an "essential element" of a charge, claim, or defense. Iowa R. Evid. 5.405(*b*).

Character is not an essential element of justification. Iowa Code section 704.3 provided, "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." Depending on the facts and circumstances, a reasonable belief may exist— or may not exist—regardless of the other person's character.

Indeed, when Rule 5.405 was adopted, the Official Comment embraced *Jacoby* as "an example of Iowa application" of subsection (*b*). *Jacoby*, as noted, does not allow specific acts to prove a victim's character. 260 N.W.2d at 838.

Furthermore, *Dunson* has come under criticism. Professor Laurie Doré has noted that *Dunson* did not overrule *Klaes* and is inconsistent with it. 7 Laurie Kratky Doré, *Iowa Practice Series*™*: Evidence* § 5.405:2, at 324–25 (2017 ed.) [hereafter Doré]. In her view, *Klaes* is right:

> [U]nless a defendant claims to have known about the victim's violent conduct (and therefore acted reasonably in using defensive force), a defendant seeking to admit evidence of a victim's character to support self-defense should only be permitted to use reputation or opinion evidence, not specific instances of the victim's conduct.

*Id.* at 325–26.

One of Professor Doré's former colleagues, Professor James Adams, has likewise criticized *Dunson* for "ignoring the analysis in *Jacoby* and *Klaes*" and giving "no effect" to the first part of rule 5.405. James A. Adams, *Admissibility of Proof of an Assault Victim's Specific Instances of Conduct as an Essential Element of a Self-Defense Claim Under Iowa Rule*

*of Evidence 405*, 39 Drake L. Rev. 401, 416–17 (1990).  He goes on to say that "nothing in the Iowa Rules of Evidence or the Federal Rules of Evidence from which they were derived . . . suggests such an interpretation [i.e., the interpretation in *Dunson*] is appropriate or desirable."  *Id.* at 429.  Even if *Dunson* were correct, Professor Adams believes it would be subject to criticism for making a change in interpretation "without discussion of prior case law or any basis for the change."  *Id.*

Thus, we hold that a defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim *unless* the conduct was previously known to the defendant.  *See Klaes*, 375 N.W.2d at 676 ("[W]e are not dealing with the special situation in which the person claiming self-defense had actual knowledge of the other person's prior acts of violence."); *Jacoby*, 260 N.W.2d at 838–39 ("[A]ccording to most courts . . . if, prior to the homicide, the defendant . . . knew of other acts of violence of the deceased, he may, in support of his contention that he had reasonable grounds to believe himself in imminent danger from an assault by the deceased, introduce evidence of such prior unlawful acts of violence by the deceased." (alteration in original) (quoting 40 Am. Jur. 2d, *Homicide*, § 306, at 575)); Doré, § 5.405:2, at 325 (distinguishing the situation where "a defendant claims to have known about the victim's violent conduct").

Our interpretation of rule 5.405 gives full effect to the rule.  There are some cases where character is an essential element—*Klaes* gives alienation of affections and slander as examples.  375 N.W.2d at 676.  Professor Doré notes, "In child custody situations . . . , the character trait of moral unfitness may be an element and specific instances of conduct may be used to demonstrate that character trait."  Doré, § 5:405:2, at 526–27.  But self-defense is not one of those situations.

Accordingly, we hold the district court did not err in ruling that Williams could not introduce Fleming's criminal record or other specific acts of violence not previously known to Williams.

## VIII. Stand Your Ground Defense.

Lastly, Williams argues the district court erred when it held that amended Iowa Code section 704.1, which became effective on July 1, 2017, did not apply in his case. *See* 2017 Iowa Acts ch. 69, § 37 (codified at Iowa Code § 704.1 (2018)). During the 2017 session, the general assembly rewrote section 704.1 to read as follows:

> 1. "*Reasonable force*" means that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.
>
> 2. A person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a reasonable basis for the belief of the person and the person acts reasonably in the response to that belief.
>
> 3. A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter.

Iowa Code § 704.1 (2018).

Most notable is subsection 3, a new stand your ground provision, which eliminates any duty to retreat before using force if one is not engaged in illegal activity. *Id.* The legislature provided that the 2017 amendment would not become effective until July 1, 2017—a few hours *after* Williams shot Fleming the evening of June 30. *See* 2017 Iowa Acts ch. 69, § 50; Iowa Code § 3.7(1) (2017).

We conclude the district court made the right call when it held the 2017 amendment did not apply in this case. The amendment was a

change in substantive law, and it was the legislature's prerogative not to make that change effective until July 1.

Williams relies on Iowa Code section 4.13(2), which provides,

> If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment if not already imposed shall be imposed according to the statute as amended.

However, the 2017 amendment did not alter the punishment for murder; at most, it expanded the scope of a potential defense. *See* 2017 Iowa Acts ch. 69, § 37 (codified at Iowa Code § 704.1 (2018)).

Recently, in *State v. Harrison*, we held that the 2016 legislation dividing what had been second-degree robbery (a class "C" felony) into second-degree robbery and third-degree robbery (a class "C" felony and an aggravated misdemeanor) did not apply retroactively. 914 N.W.2d 178, 205 (Iowa 2018). We explained,

> It is a well-settled law that substantive amendments to criminal statutes do not apply retroactively. Since third-degree robbery did not exist in the Iowa Code at the time of Harrison's offense, Harrison was not entitled to a jury instruction differentiating between felony robbery and misdemeanor robbery.

*Id.* (citations omitted). We think *Harrison* controls here.[8]

### IX. Conclusion.

For the foregoing reasons, we conditionally affirm Williams's conviction and sentence, but we remand this case for further consideration of Williams's claim that his jury was not drawn from a fair cross section of the community in violation of the Sixth Amendment. If the court rejects

---

[8]In any event, it is highly questionable whether the facts of this case present a stand your ground situation. Williams did not claim Fleming approached him; rather, Williams acknowledged he approached Fleming and then shot him while he sat in the vehicle.

that claim, then Williams's conviction and sentence shall stand. If the court accepts that claim, Williams shall receive a new trial.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Cady, C.J., and Wiggins and Appel, JJ., concur in divisions IV, VII, and VIII of the court's opinion but dissent as to divisions V and VI.

Waterman, Christensen, and McDonald, JJ., concur in divisions V, VI, VII, and VIII of the court's opinion but dissent as to division IV.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I agree with the majority opinion's analysis in division IV on the fair-cross-section claim, in division VII on Fleming's convictions and other prior bad acts not known by Williams, and in division VIII on the "stand your ground" defense. I feel compelled to dissent from the majority opinion's analysis in division VI on the implicit-bias instruction and in division V on individualized voir dire on racial attitudes.

Iowa is one of the worst states in the Union regarding racial disparity in imprisonment. As I pointed out in *State v. Plain*, a 2016 report by The Sentencing Project showed blacks made up 3.1% of Iowa's population, while 25.8% of Iowa's prison population was black. 898 N.W.2d 801, 830 (Iowa 2017) (Wiggins, J., concurring specially). These statistics are disgraceful. I believe this racially disparate treatment of blacks by our criminal justice system is due to implicit racial bias.

Although the judicial system cannot fix the problem on its own, it is incumbent on every judge in every county courthouse to do whatever is necessary to make sure black men and women receive a trial with a fair and impartial jury free of racial bias. This starts with not only recognizing the existence of racial bias in our state, but also making a concerted effort to rid our courthouses of any hint of racial bias. This task requires diligence and extra trial time.

The majority in *Plain* mandated courts be proactive about implicit bias in the future when it said, "We strongly encourage district courts to be proactive about addressing implicit bias; however, we do not mandate a singular method of doing so." *Id.* at 817 (majority opinion). In my concurring opinion, I stated,

Due to the disgraceful disparity in the punishment and incarceration between blacks and whites, we should not wait for further research and study on the issue of implicit bias and racial disparity. The demand for justice to our black citizens does not allow for further stalling. A defendant and his or her counsel are in the best position to know whether the circumstances of the present case warrant an implicit-bias instruction. A defendant and his or her counsel are also in the best position to determine whether instructing jurors on implicit bias may lead to a better outcome or not.

In the future when a defendant requests an implicit-bias instruction and implicit bias *may* have an effect on a jury, there is no reason for the court not to instruct the jury on implicit bias.

*Id.* at 830 (Wiggins, J., concurring specially). Two other justices agreed with this language. *Id.*

Nevertheless, the district court here chose to ignore it. The instruction given by the court stated,

As you consider the evidence, do not be influenced by any personal sympathy, bias, prejudices or emotions. Because you are making very important decisions in this case, you are to evaluate the evidence carefully and avoid decisions based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. The law demands that you return a just verdict, based solely on the evidence, your reason and common sense, and these instructions. As jurors, your sole duty is to find the truth and do justice.

This was not an instruction aimed at addressing implicit bias. Rather it was an instruction dealing with personal sympathy, conscious biases or prejudices, or emotions.

Implicit biases are held deep in the subconscious, and as humans, we are often unaware of them or their influence on our cogitations and actions. *E.g.,* Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 149 (2010) ("Implicit biases are the plethora of fears, feelings,

perceptions, and stereotypes that lie deep within our subconscious, without our conscious permission or acknowledgement. Indeed, social scientists are convinced that we are, for the most part, unaware of them. As a result, we unconsciously act on such biases even though we may consciously abhor them."); Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Calif. L. Rev. 945, 946 (2006) ("[T]he science of implicit cognition suggests that actors do not always have conscious, intentional control over the processes of social perception, impression formation, and judgment that motivate their actions."); Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1129 (2012) [hereinafter Kang et al.] ("[Implicit social cognition's, which includes implicit bias,] impact on a person's decisionmaking and behaviors does not depend on that person's awareness of possessing these attitudes or stereotypes. Consequently, they can function automatically, including in ways that the person would not endorse as appropriate if he or she did have conscious awareness."). In addition, research portends that implicit bias will influence jurors unless the court expressly brings the subject to the jurors' attention. *See, e.g.*, Kang et al., 59 UCLA L. Rev. at 1184–86. Thus, a jury instruction addressing implicit bias must clearly present itself as one on implicit bias and must target the hidden and subconscious nature of that type of bias. The bias instruction given in this case did not do so.[9]

---

[9]This can be seen by comparing the language of the instruction given in this case with an actual implicit-bias instruction given by a federal district court judge, for example. Now-retired Judge Mark W. Bennett, who served in the United States District Court for the Northern District of Iowa, used to give the following implicit-bias instruction:

> Do not decide the case based on "implicit biases." As we discussed in jury selection, everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes, that is, "implicit biases," that we may not be aware of. These hidden thoughts can impact what we see and hear, how we remember what we see and hear, and how we make important decisions.

The requested instruction covered implicit bias. It stated,

Our system of justice depends on judges like me and jurors like you being able and willing to make careful and fair decisions. Scientists studying the way our brains work have shown that, for all of us, our first responses are often like reflexes. Just like our knee reflexes, our mental responses are quick and automatic. Even though these quick responses may not be what we consciously think, they could influence how we judge people or even how we remember or evaluate the evidence.

Scientists have taught us some ways to be more careful in our thinking that I ask you to use as you consider the evidence in this case:

Take the time you need to test what might be reflexive unconscious responses and to reflect carefully and consciously about the evidence.

- Focus on individual facts, don't jump to conclusions that may have been influenced by unintended stereotypes or associations.

- Try taking another perspective. Ask yourself if your opinion of the parties or witnesses or of the case would be different if the people participating looked different or if they belonged to a different group?

- You must each reach your own conclusions about this case individually, but you should do so only after listening to and considering the opinions of the other jurors, who may have different backgrounds and perspectives from yours.

Working together will help achieve a fair result.

---

Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. The law demands that you return a just verdict, based solely on the evidence, your individual evaluation of that evidence, your reason and common sense, and these instructions. Our system of justice is counting on you to render a fair decision based on the evidence, not on biases.

Kang et al., 59 UCLA L. Rev. at 1182–83 (quoting Mark W. Bennett, Jury Pledge Against Implicit Bias (2012) (unpublished manuscript) (on file with authors)). Judge Bennett's instruction is strikingly similar to the one given in the instant case. But, unlike Judge Bennett's instruction, the instruction given here does not specifically mention "implicit biases," their hidden nature, or their potential unintended effect.

Achieving an Impartial Jury Project, *Toolbox*, Am. Bar Ass'n 17–20 (footnotes omitted), https://www.americanbar.org/content/dam/aba/ publications/criminaljustice/voirdire_toolchest.pdf (last modified Oct. 13, 2015).

This instruction first explains to the jurors the concept of implicit bias. *Id.* at 17–18 & nn.68–71. The instruction then requires the jurors to be aware of implicit bias when considering the matter. *See id.* at 18 & nn.72–73. Finally, it tells the jurors to focus on the facts without jumping to any conclusions influenced by stereotypes. *Id.* at 19 & n.74. It also tells the jurors to look at the evidence from the perspective of a person belonging to a different group. *Id.* at 19 & nn.75–76.

The majority reviewed this case on abuse of discretion. That is incorrect. We overturned the prior law on abuse-of-discretion review when a party requests a jury instruction. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707–08 (Iowa 2016). In *Alcala*, we held review of "refusals to give a requested jury instruction [is] for correction of errors at law" when Iowa law *requires* the instruction be given. *Id.* at 707. "Iowa law requires a court to give a requested instruction if it correctly states the applicable law and is not embodied in other instructions." *Id.* (quoting *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994)). As noted above, the district court did not embed the requested instruction in the instruction it gave the jury. Racial bias goes to the heart of a fair trial. A fair trial is a tenet of due process in this country. The instruction given concerned personal bias, not implicit bias. Moreover, the requested instruction is a correct statement of law. Therefore, I would find an error at law for not giving the requested instruction.

As to the majority's analysis regarding individualized voir dire on racial attitudes, I must also dissent. In light of the great racial disparity

in imprisonment in this state, I disagree with the district court judge's conclusion that expediently completing voir dire in one day was more important than Williams's quest to find a jury free of racial bias. The majority's myopic and maladroit paralogism that the district court found it was more important to finish voir dire in one day rather than to worry that a prospective juror would be exposed to improper influences overnight is an excuse, not a reason. It is also illogical. Wouldn't the same concern apply to jurors the parties picked to serve? Why wouldn't these jurors be subject to the same improper influences? Admonitions take care of this problem. *See, e.g., State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010) ("We presume juries follow the court's instructions.").

It appears to me that the judge did not allow individual voir dire for no other reason than to shorten the trial. This is unacceptable, especially considering the State charged Williams with first-degree murder with the penalty being life in prison without the possibility of parole. This is equivalent to the death penalty in Iowa.

Studies show jurors do not always disclose everything in voir dire. *E.g., Collins v. State*, 158 A.3d 553, 562 n.8 (Md. 2017). Thus, it is necessary to do a thorough voir dire to root out implicit bias. That takes time. Scheduling concerns should not be the basis for refusing to conduct individual voir dire. *United States v. Blitch*, 622 F.3d 658, 667 (7th Cir. 2010) (finding abuse of discretion when trial judge decided not to conduct individualized voir dire on the issue of juror bias because of scheduling concerns regarding the judge's upcoming commitment to sit by designation on another court). Therefore, I would find an abuse of discretion in not allowing individualized voir dire.

In conclusion, I would reverse the judgment of the district court and remand for a new trial.

Cady, C.J., joins this concurrence in part and dissent in part.

**APPEL, Justice (concurring in part and dissenting in part).**

I concur with the majority opinion except for divisions VI (individualized voir dire) and VII (implicit bias).

I want to specifically point out, on the issue of fair cross section of the jury, I agree for reasons discussed in my opinion in *State v. Lilly*, ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., concurring specially). I dissent, however, on the question of whether the district court abused its discretion in refusing to give an implicit-bias instruction. I also dissent on the question of whether a defendant may be permitted to engage jurors individually in voir dire about race issues.

## I. Systemic Approach Required.

I write separately to emphasize, again, that in order to ensure criminal defendants receive a fair and impartial trial with a cross section of members of the community, a systemic approach is required. The progress that has been made today on the question of fair cross section in jury pools is important. *See id.* But in my view, the promise of providing defendants with a fair and impartial trial free from racial discrimination will require an across-the-board approach. Any effective effort to address the potential of racial bias must include approval of individual inquiry of racial bias in voir dire, revision or abandonment of the approach to peremptory challenges of *Batson v. Kentucky*, 476 U.S. 79, 93–98, 106 S. Ct. 1712, 1721–24 (1986), *see State v. Veal*, ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., dissenting), the availability of an implicit-bias instruction at the request of the defendant as suggested by the American Bar Association, and development of the principles outlined in *Peña-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct. 855, 869 (2017), which permit a defendant to penetrate the jury box when there is evidence that the verdict

was tainted by racial discrimination. This case involves the questions surrounding an implicit-bias instruction and individualized voir dire.

## II. Implicit-Bias Instruction.

I agree fully with Justice Wiggins's opinion on the question of whether the district court erred in failing to give an implicit-bias instruction in this case. The district court declined to give the proposed instruction because, in its view, the instruction has not been specifically approved by this court and other instructions adequately covered the subject. The district court was plainly incorrect in both of these observations.

In *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017), we considered a case where the district court declined to give an implicit-bias instruction. The district court denied the instruction because "it knew of no authority approving or requiring the instruction and because the instruction was not included in the Iowa State Bar Association's model instructions." *Id.* at 817.

In *Plain*, this court rejected the district court's "no authority" rationale. The *Plain* court emphasized that the cautionary implicit-bias instruction proposed in the case was a correct statement of antidiscrimination principles and was thus permitted under Iowa law. *Id.* Because the district court's judgment relied upon an error of law, the majority concluded that the district court's decision refusing to give the instruction was an abuse of discretion. *Id.*

This case is indistinguishable from *Plain*. The ABA model instruction, although more verbose than that proposed in *Plain*, is a correct statement of law. As in *Plain*, prior approval of this court or the Iowa State Bar Association was not required.

Further, in this case, the district court suggested that other instructions regarding burden of proof and other instructions were the equivalent of an implicit-bias instruction. In particular, the district court seemed to rely on Instruction 5, which generally stated that jurors were not to be influenced by "any personal sympathy, bias, prejudices or emotions," to "evaluate the evidence carefully," to "avoid decisions based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases," and to return a verdict based "solely on the evidence, your reason, and common sense."

There is nothing wrong, of course, with Instruction 5. But it does not cover the question of implicit bias. Implicit bias is bias that is subconscious or unintentional. *See generally Plain*, 898 N.W.2d at 830–36 (Appel, J., concurring specially). Because of the often unrecognized but potentially very powerful pull of implicit bias, the American Bar Association has recommended that judges should give an instruction on implicit bias. While we have not yet required a particular approach to implicit bias, the *Plain* court declared, "We strongly encourage district courts to be proactive about addressing implicit bias; however, we do not mandate a singular method of doing so." *Id.* at 817 (majority opinion). It was error for the district court to conclude that Instruction 5 covered the same subject matter as an implicit-bias instruction.

The concept of implicit bias is old, but the notion of an implicit-bias instruction is somewhat new. Change comes hard. In my view, however, the time has come, and has in fact long since passed, to adjust our approach to implicit bias in our courtrooms. Giving an appropriate implicit-bias instruction at the request of the defense is not a panacea, but it moves us in the right direction in seeking to ensure that racial bias plays no part in our justice system.

There is some good news in all of this. Researchers have found that instructions that emphasize fairness and the importance of recognizing racial bias can have impact. Elizabeth Ingriselli, Note, *Mitigating Jurors' Racial Biases: The Effects of Content and Timing of Jury Instructions*, 124 Yale L.J. 1690, 1714–15 (2015). The impact is probably greatest if the instruction is given at the beginning of trial as well as after the evidence is received.

**III.  Individual Voir Dire of Jurors Regarding Racial Bias.**

I also conclude that the district court erred in not allowing individual voir dire. I join Justice Wiggins's opinion on this point as well. I write separately to emphasize the limitations of conventional group voir dire in rooting out racial bias and the modest potential of individual voir dire, properly handled, in addressing the potential of racial bias.

First, closed-end judge-based questioning is ineffective in identifying racially prejudiced jurors. As noted by a leading scholar many years ago, closed-end questions from the court, such as questioning whether the jurors can be fair and impartial, base their verdict on the evidence, and follow the court's instructions, would not smoke out professed racists like Lester Maddox or George Wallace. Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts*, 56 U. Chi. L. Rev. 153, 160 (1989); *see also* Barbara Allen Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan. L. Rev. 545, 547 (1975) (noting a juror motivated to remain on a panel "will evade or misconstrue, unconsciously or deliberately, general voir dire questions in order to avoid answering and possibly being struck").

We have previously recognized the shortcomings of voir dire by legal catechism. In *Jonas*, we canvassed various authorities cautioning against relying upon a "magic question" approach to voir dire in juror

rehabilitation. *State v. Jonas*, 904 N.W.2d 566, 571–72 (Iowa 2017); *see also Dingle v. State*, 759 A.2d 819, 826–28 (Md. 2000) (explaining that a simple, perfunctory examination by a judge would not reveal misconceptions or unconscious biases); James H. Gold, *Voir Dire: Questioning Prospective Jurors on Their Willingness to Follow the Law*, 60 Ind. L.J. 163, 188–90 (1985) (arguing that defendants should be permitted to individually question prospective jurors to expose possible bias against a rule of law).

Further, aside from the nature of the questioning, the environment matters. As noted some time ago, "Collective questioning on sensitive issues may not elicit a response from some jurors who would respond in private." *Commonwealth v. Shelley*, 409 N.E.2d 732, 740 n.12 (Mass. 1980). As a result, the ability of the defense to engage in individualized voir dire, while hardly foolproof, at least increases the likelihood of identifying jurors who may not be fair and impartial.

In addition, the advent of the large body of social psychology literature on implicit bias means that if a lawyer is to engage in effective voir dire, the advocate cannot skate over the surface with collective questions to jurors about explicit racial bias, which all will deny in any event. A more individualized approach is required if implicit bias is to be explored. *See* Nat'l Ctr. for St. Cts., *Jury Trial Innovations* 69 (G. Thomas Munsterman et al. eds., 1st ed. 1997) (stating that individual voir dire is the best method for jury candor); John H. Blume et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1250 (2001) (explaining that social science research supports individually questioning jurors to get candid answers); Neal Bush, *The Case for Expansive Voir Dire*, 2 Law & Psychol. Rev. 9, 20 (1976) (observing that the court is intimidating to potential jurors and individual voir dire may make

them feel more comfortable); Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 U.C. Irvine L. Rev. 843, 846 (2015) [hereinafter Lee] (explaining that while closed-end questions are unlikely to be helpful, a series of open-end questions educating jurors about implicit bias may be helpful); David Suggs & Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245, 261 (1981) (advocating individual voir dire); Tania Tetlow, *Why* Batson *Misses the Point*, 97 Iowa L. Rev. 1713, 1740 (2012) ("The right to voir dire about racial prejudice remains an incredibly important procedural protection to root out juror racism."); *see also* Am. Bar Ass'n, *Principles for Juries & Jury Trials* 65, 73 (2005) (encouraging questioning of juries both as a panel and individually, and citing studies showing focused examination in more private setting can yield invaluable information regarding juror qualifications).

Further, even if individual voir dire about race-related issues does not lead to the exercise of a strike, it can serve to mitigate the potential effects of implicit bias. Social science studies suggest that calling jurors' attention to the possibility of implicit bias can be a helpful tool in causing jurors to reflect and lessen its impact. *See* Lee, 5 U.C. Irvine L. Rev. at 843 (summarizing studies).

There is no claim in this case that the victim was white. But the better-reasoned state court cases indicate that a member of a racial minority is entitled to conduct voir dire on the issue of racial prejudice even if the victim is not of another race. *See Maes v. Dist. Ct.*, 503 P.2d 621, 625 (Colo. 1972) (en banc) (holding that there is a right to inquire on voir dire regarding racial views under the Colorado Constitution even if the crime does not have a racial element); *People v. Baker*, 924 P.2d 1186, 1191 (Colo. Ct. App. 1996) (discussing a right to inquire into the racial views of the venire pool under the due process and jury trial provisions of

the Colorado Constitution); *State v. Marsh*, 362 A.2d 523, 525 (Conn. 1975) ("Our state, by constitutional provision, allows the questioning of each prospective juror individually by counsel, and, within that framework, counsel is entitled to interrogate on the subject of race prejudice."); *Bowie v. State,* 595 A.2d 448, 453 (Md. 1991) (explaining that state law permits questioning of jurors for racial prejudice in a trial of an African-American charged with murder at the request of defense); *State v. Williams*, 550 A.2d 1172, 1190 (N.J. 1988) (stating that when the defendant is a member of a racial minority, a more searching voir dire should be conducted if requested).

The usual reason expressed for curtailing voir dire is time. But as was observed long ago, "[E]xpedition is clearly subsidiary to the duty to impanel an impartial jury." *United States v. Dellinger*, 472 F.2d 340, 370 n.42 (7th Cir. 1972).

Here, the defendant, an African-American, was about to be tried for first-degree murder. He faced the prospect of life in prison without parole, Iowa's equivalent of the death penalty. African-Americans comprised only 2.3% of the population of the county in which he was being tried. Further, in addition to starting as a distinct minority, the jury panel was not representative of the population of African-Americans. The trial judge declined to draw new jury pools because they would no doubt suffer from the same defect as the pool before the district court. So, with a virtual assurance that no African-Americans would be on this jury, the district court was unwilling to take a few extra minutes to allow the defendant to explore sensitive issues involving racial bias even though the African-American defendant faced life in prison without parole. That, to me, is an abuse of discretion. To the extent *State v. Windsor*, 316 N.W.2d 684, 687 (Iowa 1982), is to the contrary, I would overrule it.

**IV. Conclusion.**

The best way to ensure fair and impartial juries for African-Americans is to have African-Americans serving on Iowa juries. *See Georgia v. McCollum*, 505 U.S. 42, 61, 112 S. Ct. 2348, 2360 (1992) (Thomas, J., concurring) ("[S]ecuring representation of the defendant's race on the jury may help to overcome racial bias and provide the defendant with a better chance of having a fair trial."); *Peters v. Kiff*, 407 U.S. 493, 503–04, 92 S. Ct. 2163, 2169 (1972) ("When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience . . . . [I]ts exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."); *State v. LaMere*, 2 P.3d 204, 212 (Mont. 2000) ("[D]iversity begets impartiality."); Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Personality & Soc. Psychol. 597, 597 (2006) (explaining that racially diverse juries were more amenable to a discussion of racism, discussed more trial evidence, and made fewer errors). But that is not enough. We must look to other potential tools to address both explicit and implicit bias. Although individualized voir dire and explicit bias instructions do not guarantee impartiality, they certainly promote it. Because of the failure to allow individual voir dire and the failure to give an explicit bias instruction at the request of the defendant, I would reverse the conviction and remand for a new trial.

**McDONALD, Justice (concurring in part and dissenting in part).**

For the reasons set forth in my separate opinions in *State v. Lilly*, ___ N.W.2d ___, ____ (Iowa 2019), and *State v. Veal*, ____ N.W.2d ___, ____ (Iowa 2019), I respectfully dissent from division IV of Justice Mansfield's opinion and the resultant judgment.  I concur in full in the remainder of Justice Mansfield's opinion.

Waterman, and Christensen, JJ., join this concurrence in part and dissent in part.