# IN THE COURT OF APPEALS OF IOWA

No. 18-0268
Filed July 1, 2020

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**QUARZONE ERIKEY MARTIN,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Linn County, Patrick R. Grady, Judge.

Quarzone Erikdey Martin appeals from convictions for second-degree murder, willful injury causing serious injury, and going armed with intent. **REVERSED AND REMANDED.**

John W. Pilkington of Nidey Erdahl Fisher Pilkington & Meier, PLC, Marengo, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Doyle and Schumacher, JJ.

**BOWER, Chief Judge.**

Quarzone Erikdey Martin appeals from convictions for second-degree murder, willful injury causing serious injury, and going armed with intent. He contends the trial court erred in instructing the jury with respect to Iowa Code section 704.2B (2017) and abused its discretion in excluding evidence of the decedent's violent character and denying his motion for mistrial. Finding the first issue dispositive, we reverse and remand for new trial.

**I. Background Facts and Proceedings.**

Martin admitted that on July 2, 2017, he shot Johnny Moore Jr. and Andrew Meeks in the course of what started out as an arranged sale of a controlled substance; Martin was to sell and Meeks was to purchase 300 tablets of Xanax. Meeks died of his gunshot, but Moore survived his injuries. Martin was charged with first-degree murder, willful injury causing serious injury, and going armed with intent. Martin claimed that he acted in self-defense.

At trial, evidence was presented that on July 1, 2017, Meeks contacted Martin to purchase thirty to forty Xanax[1] pills for $5.00 per pill. Martin and Meeks had not met before. Martin and Meeks arranged to meet in the Walmart parking lot on the southwest side of Cedar Rapids to complete this transaction. Upon meeting at the Walmart parking lot, Meeks had Martin get into the front passenger

---

[1] The generic name is alprazolam—a medication used to treat panic and anxiety disorders—and it "belongs to a class of medications called benzodiazepines which act on the brain and nerves . . . to produce a calming effect." *Xanax*, WebMD, https://www.webmd.com/drugs/2/drug-9824/xanax-oral/details (last visited June 24, 2020).

seat of his vehicle to complete the sale. The transaction was completed without incident.

On July 2, Meeks and Moore were together at Meeks's apartment he shared with his girlfriend, Carryne Olds. Meeks was drinking a mixture of juice and Xanax. He was looking for more Xanax and became angry with Olds when he found out she had taken some of the pills. Olds said she had money to buy some more, and Meeks contacted Martin to purchase 300 Xanax pills for $4.00 per pill. Meeks took about $600 from Olds, and he and Moore then drove to the Walmart in Olds's black Ford Fusion.

Moore testified that before he and Meeks left the apartment, he asked Meeks if he was "going to actually spend the money or was he just going to go, you know, do something. And he told me no, that we wasn't doing that, we was just going to get the pills and then we was going to have a good time and hang out." When Moore was asked why he had that conversation with Meeks, Moore responded, "if that's the plan, then if I need to protect myself or protect him" and would have taken a gun. Moore stated they did not take guns with them.

When Meeks and Moore arrived at Walmart, they parked for a time. Martin arrived with four others in a tan Buick Rendezvous, and Martin came to Meeks's vehicle. Meeks told Moore to get into the back seat and told Martin to get in the front seat.

Meeks, Moore, and Martin drove to another, less traveled, part of the parking lot and backed into a parking space. Store surveillance video shows Martin getting out of the vehicle very briefly and then getting back in and Meeks's vehicle moving forward. Video from another angle shows Meeks's vehicle

traveling across the parking lot into a barrier. Meeks falls out or bails out of the moving vehicle before the vehicle strikes the barrier. He gets up and returns to the car. Meanwhile, the front passenger door opens and Martin runs away. The rear passenger door opens moments later and Moore gets out slowly, approaches the rear of the vehicle, and leans over the trunk. Meeks died of gunshot injuries, and Moore suffered a gunshot to the chest that travelled through the front seat before striking him.

Moore testified that while he, Meeks, and Martin were parked, Martin presented Meeks with a bag of pills, and Meeks asked Moore to count them to make sure they were all there. While Moore was counting the pills, Meeks removed the money from the center console and started to count the money. Moore stated the pills were "short" and handed them back to Meeks. Meeks told Martin he wasn't interested, gave the pills back to Martin, and placed the money on the center console. Moore testified Martin tried to get Meeks to buy the pills and "the next time that he come back that he would give him extra." Martin stepped out of the vehicle briefly, Meeks put the car in gear and had his foot on the brake, and then Martin "hopped back in the car." When Martin got back in the car, Moore testified he was pointing a handgun at Meeks. Meeks tried to drive, and Meeks and Martin were "tussling." Moore stated he "froze up" and just sat in the rear seat. Martin then fired a shot at Meeks, the car hit the rail, and Martin turned around and shot Moore. Moore did not remember what happened next until he opened his eyes and Meeks was in the front seat telling him they had to get out of the car. Moore was able to get out of the car but realized he had been shot and could not breath. He called 911 after seeing Meeks fall over and not get back up.

Moore was cross-examined about other statements he had given to police. On July 3, while in the hospital, Moore first told police he and Meeks were shot because they would not give Martin a ride. He then said Meeks needed more Xanax and had come up with a plan to rob Martin of the pills by pulling a "drug rip," i.e., taking drugs or money from the seller rather than purchasing drugs at an arranged buy. While they were at Walmart, they stopped at a fireworks stand and Olds called Meeks, telling him not to spend the $600 in Olds's car console because it was rent money. Moore told the officer on July 3 that he got shot because he was trying to push Martin out of the car.

On October 2, Moore went to the police and gave another statement more in line with his trial testimony.

Defense counsel questioned Moore extensively about his earliest statements to police about Meeks's plan to take the pills from Martin by tricking him into getting out of the car and driving off and how the surveillance video supported that version of events rather than Moore's trial testimony. For example:

> Q. But that backing in makes it easier to do a robbery, doesn't it? A. No.
> Q. It doesn't? A. No.
> Q. Because if you back into the spot and you trick a guy out of a car, then you can just pull off? A. That wasn't the case.
> Q. That's exactly what happened. A. No.
> Q. On the video, the guy gets out and then his head goes down and then the car takes off with the door open? A. With the person hopping back in the car with a gun, yes.
> Q. It didn't work, but that's what you were trying to do? A. No, it wasn't.
> . . . .
> Q. That Andrew, who was willing to put hands on Carryne over Xans, who was searching high and low in his house for Xans and now he has Xans in his life and cash in the console and he's not going to buy some Xans? A. No, because they was short.

Q. Because there were only [seventy]? A. Yeah. It wasn't all there.

Q. There was 200 in those other bags? A. I don't know what was in the other bag. Like I said, I only counted the one bag. . . .

. . . .

Q. So you had cash in the car? A. Yes.

Q. And Andrew had Xans in his lap, right? Right? A. Yes.

Q. And he gives the Xans back, says I don't want these? A. Yes.

Q. And then for some unknown reason that you can't even explain today, the guy gets upset and pulls out a gun? A. I guess.

Q. Well, that's your story, isn't it? A. Yes.

Q. Because he could just sell these Xans to somebody else if he wanted to, right? A. He could.

Jacob Steinberg testified he was driving north through the Walmart parking lot on July 2 when he noticed a car going south.

And I noticed the back door was open kind of swinging around, it looked like, and it then shut and they were just driving away. It looked like there was a slight struggle between the people in the passenger seat back and front.

Q. And could you tell how many people were in this vehicle? A. Three.

Q. Three. And as you came close to the vehicle, you said that you observed a struggle between the three individuals in the vehicle? A. It was more of a struggle between the front passenger and the rear passenger.

Q. Could you see what type of struggle, or can you describe it a little bit more detail to— A. It just looked like they were having more of a physical altercation in the vehicle.

Steinberg also testified he heard gunshots coming from the direction of the car.

The defense sought to question witnesses about Olds's statements whether Meeks had been involved in a drug rip before the altercation with Martin. Martin argued Meeks's character for violence was relevant to his justification defense whether or not Martin was aware of the earlier event. The district court excluded the evidence.

Investigator Matthew Denlinger testified he had interviewed Olds on July 3. Olds told him she overheard Meeks and Moore talking about purchasing Xanax pills and the plan was they would go buy pills, Meeks would drive, Moore would sit in the back seat and count the money, and they would say something or do something to trick the seller out of the car and then drive away. On cross-examination, Investigator Denlinger testified that the video recordings of the events of July 3 "really looked like a drug rip. But I'm kind of open to the possibility that it was and I'm open to the possibility that maybe it wasn't."

Martin testified in his own defense. He stated that after he got into Meeks's vehicle and they parked, he pulled out three bags of Xanax pills, each containing approximately 100 pills. He tried to hand the pills to Meeks but Meeks said "they wasn't for him, they was for the guy in the back seat." Martin testified, "When I gave them to the guy in the back seat, he said no offense, I just want to make sure they all here. And I said no problem and everything. That's what I—I asked him where the money is so I can count that also." Martin testified Moore then started looking around and said he had dropped his wallet and asked Martin to look around the front passenger seat because that is where he had been sitting. Martin then got out of the car to search under the seat. While he was leaning over, he felt the car move and "knew something was up." He tried to get back in the car "[b]ecause my pills was in the car" and he was afraid of falling out of the now moving vehicle. Martin testified, "[A]s soon as I get back in the car, [Meeks] is reaching over trying to shove me out of the car and Mr. Moore is coming over the middle console to help him."

Martin acknowledged he was armed with a nine millimeter Luger for protection. However, he testified he did not have the gun in his hand when he got back in the car, "I was just holding onto whatever I could to not fall out of the car." Martin testified:

> But as soon as the door closed, that's when [Meeks] immediately started to punch me. He abandoned the wheel. He stopped driving.
>
> Q. When you got your gun out then, what was your intent while they were beating on you? When you got your gun out, what was your intent at that time? A. To just get them off to get control of the situation.
>
> Q. Did it concern you at all that the car wasn't being driven? A. Yes.
>
> Q. Were you afraid? A. Yes, because anything could have happened. We—He wasn't paying attention to the road, I couldn't pay attention to the road and Mr. Moore definitely wasn't paying attention to the road. They was too—They were just beating me.
>
> Q. So you went and got your gun? A. Yes.
>
> Q. And what were you going to do with that gun when you got ahold of it? A. I was—I just brought it out to—at least I thought they was going to stop, and I shot.
>
> Q. Did they stop? A. No.
>
> Q. And what did you do? A. I shot Mr. Meeks.
>
> Q. Where did you shoot Mr. Meeks? A. I'm not sure exactly.
>
> Q. Were you aiming or were you just shooting? A. I was just shooting.
>
> Q. What happened when you fired that first shot? A. When I shot Mr. Meeks, he fell back in the seat and grabbed at I guess where I shot him at.
>
> Q. All right. And how long between that shot and your second shot? A. I turned immediately around and shot Mr. Moore also.
>
> Q. And he was behind you? A. Yes. He was still over the middle console.

Moore yelled, "don't kill me" and tried to throw the pills toward Martin. The car then hit the guardrail.

Martin did not fire any more shots. He got out and ran away, grabbing his cellphone from his lap and "whatever pills was in my area."

> Q. If you had wanted to shoot these guys any more, would you have done that? A. Yes.

Q. Did you want to kill them? A. No.

Q. What was your purpose in shooting Mr. Meeks? A. My purpose in shooting Mr. Meeks was because I feared for my life. I was trapped in a car that was—they was just beating me.

Q. Did it concern you that the car was not being driven? A. Yes. That also concerned me, but like I didn't know—I didn't know what was going on. It just happened so fast.

Q. And what was your purpose in shooting Mr. Moore? A. Because he was also beating me. He was also over beating me and everything. And it just happened so fast, I just was trying to protect myself.

Q. So this wasn't a shooting because you got mad when they didn't want to buy your pills? A. No. They never said they wanted to not buy any pills, no.

On cross-examination, the State asked Martin about his drug use:

Q. . . . Do you take pills yourself? A. I used to.
Q. Did you take Xanax? A. No.
Q. What pills did you take? A. I used to pop Ecstasy.
Q. Pop what? A. Ecstasy.
Q. Did you do any other drugs?

The defense then sought a sidebar. Outside the presence of the jury, the defense

moved for a mistrial. The district court ruled:

Arguably given the context but his familiarity with Xanax would be within the scope of what was—his testimony was, and that was not objected to and I think that's—that was fair game. I do think it was a bit over the edge to ask him about other drugs. However, we have a case here where the defendant has already admitted to selling drugs, which is what I believe separates itself from [cases cited by defense counsel], as I don't remember there being an issue of drug dealing in either one of those.

Nonetheless, the court concluded, "[I]n this instance I don't think it's harmful to the

point where a mistrial is necessary."

Over Martin's objection, with regard to Martin's justification defense, the

district court instructed the jury:

Effective July 1, 2017, Iowa law provides the following:
(1) If a person uses deadly force, the person shall notify or cause another to notify a law enforcement agency about the person's

use of deadly force within a reasonable time period after the person's use of the deadly force, if the person or another person is capable of providing such notification.

(2) The person using deadly force shall not intentionally destroy, alter, conceal, or disguise physical evidence relating to the person's use of deadly force, and the person shall not intentionally intimidate witnesses into refusing to cooperate with any investigation relating to the use of such deadly force or induce another person to alter testimony about the use of such deadly force.

The failure to comply with these requirements does not, by itself, mean a person was not justified. However, you may consider the Defendant's compliance or lack of compliance with these requirements to determine if he acted reasonably when he shot Andrew Meeks and Johnny Moore.

On count 1, the jury found Martin guilty of the lesser-included offense of second-degree murder, and guilty as charged on count 2, willful injury causing serious injury, and count 3, going armed with intent.

Martin appeals, asserting the court erred in instructing the jury, abused its discretion in rejecting the evidence as to Meeks's violent character, and in denying his motion for mistrial.

## II. Scope and Standards of Review.

"We review rulings on questions of statutory interpretation for correction of errors at law." *State v. Williams*, 929 N.W.2d 621, 629 (Iowa 2019) (citation omitted). We review constitutional claims de novo. *Id.* at 628.

## III. Discussion.

Iowa Code section 704.3 provides, "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." The term "reasonable force" is defined in section 704.1(1) as

that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or

loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.

Subsection 2 states, "A person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a reasonable basis for the belief of the person and the person acts reasonably in the response to that belief." Iowa Code § 704.1(2). "Deadly force" is defined in section 704.2.

Iowa's new "Stand Your Ground" law—which took effect the day before Martin's shooting of Meeks and Moore—creates a presumption that a person reasonably believes deadly force is necessary under certain circumstances:

(1) For purposes of this chapter, a person is presumed to reasonably believe that deadly force is necessary to avoid injury or risk to one's life or safety or the life or safety of another in either of the following circumstances:

(a) The person against whom force is used, at the time the force is used, is doing any of the following:

(1) Unlawfully entering by force or stealth the dwelling, place of business or employment, or occupied vehicle of the person using force, or has unlawfully entered by force or stealth and remains within the dwelling, place of business or employment, or occupied vehicle of the person using force.

(2) Unlawfully removing or is attempting to unlawfully remove another person against the other person's will from the dwelling, place of business or employment, or occupied vehicle of the person using force.

(b) The person using force knows or has reason to believe that any of the conditions set forth in paragraph "a" are occurring.

(2) The presumption set forth in subsection 1 does not apply if, at the time force is used, any of the following circumstances are present:

(a) The person using defensive force is engaged in a criminal offense, is attempting to escape from the scene of a criminal offense that the person has committed, or is using the dwelling, place of business or employment, or occupied vehicle to further a criminal offense.

(b) The person sought to be removed is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom force is used.

(c) The person against whom force is used is a peace officer who has entered or is attempting to enter a dwelling, place of business or employment, or occupied vehicle in the lawful performance of the peace officer's official duties.

(d) The person against whom the force is used has the right to be in, or is a lawful resident of, the dwelling, place of business or employment, or occupied vehicle of the person using force, and a protective or no-contact order is not in effect against the person against whom the force is used.

Iowa Code § 704.2A.

Martin elected not to assert a defense using Iowa Code section 704.2A, but he argued he acted in self-defense after the alleged victims began beating him with their fists and driving the car in an uncontrolled manner.  Nonetheless, over Martin's objection, the district court submitted jury instruction 57, which contained verbatim the provisions of Iowa Code section 704.2B:

(1) If a person uses deadly force, the person shall notify or cause another to notify a law enforcement agency about the person's use of deadly force within a reasonable time period after the person's use of the deadly force, if the person or another person is capable of providing such notification.

(2) The person using deadly force shall not intentionally destroy, alter, conceal, or disguise physical evidence relating to the person's use of deadly force, and the person shall not intentionally intimidate witnesses into refusing to cooperate with any investigation relating to the use of such deadly force or induce another person to alter testimony about the use of such deadly force.

The instruction also contained an additional paragraph:

The failure to comply with these requirements does not, by itself, mean a person was not justified.  However, you may consider the Defendant's compliance or lack of compliance with these requirements to determine if he believed he acted reasonably when he shot Andrew Meeks and Johnny Moore.

Martin contends the trial court erred in submitting this instruction and he was prejudiced by it because he did not report the shooting incident to authorities and tossed the gun in a river after the shooting. He asserts the legislature did not intend section 704.2B to apply to all instances of deadly force. Rather, he argues an instruction concerning the duties set forth in section 704.2B would only be appropriate where a defendant is asserting justification under the new presumption of reasonableness in one of the circumstances set forth in section 704.2A(1). He observes the statutes were enacted together as part of the new "stand your ground" legislation. He asserts the legislature, in broadening the acceptable use of deadly force through section 704.2A, enacted section 704.2B to limit those new provisions rather than limit the pre-existing law on self-defense. He also contends applying it under the circumstances of his case would violate his Fifth Amendment rights against self-incrimination. We need only address Martin's Fifth Amendment claim as it is dispositive.

Our supreme court has recently held a jury instruction implementing section 704.2B and authorizing an inference of guilt in a murder case because the defendant breached a legal duty to make a report "unconstitutionally penalizes the defendant's silence and is therefore improper to use in *all* cases." *State v. Gibbs*, 941 N.W.2d 888, 901 (Iowa 2020). Here, the trial court submitted an improper jury instruction not having the benefit of the *Gibbs* case. Consequently, reversal is required unless error was harmless beyond a reasonable doubt. *See id.* at 900.

In *Gibbs*, the court found error *was* harmless beyond a reasonable doubt because "[t]he evidence of guilt was overwhelming":

> This was the rare murder case where the murder was captured on [law enforcement] video. The video shows Gibbs entering the scene and shooting at Wessels as Wessels is backing up, withdrawing, and disengaging. Other eyewitnesses corroborated the video. Even when Gibbs was confronted with the video's existence, Gibbs repeatedly lied, denying he was the shooter. Gibbs also dissembled about his clothing and tried to lead the police astray by giving them a cell phone he had not been using for months.

*Id.* We cannot say the same here because there is not overwhelming evidence of Martin's guilt or that he did not act in self-defense. Consequently, we reverse and remand for a new trial.[2]

**REVERSED AND REMANDED.**

---

[2] We also observe the supreme court has recently held, "[A] defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim *unless* the conduct was previously known to the defendant." *Williams*, 929 N.W.2d at 636.