# IN THE COURT OF APPEALS OF IOWA

No. 19-0929
Filed February 17, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**SHAWN EUGENE DAVIS,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, William P. Kelly, Judge.


Shawn Davis appeals his conviction for second-degree murder.
**AFFIRMED.**

Karmen Anderson, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Vaitheswaran and Greer, JJ.

**BOWER, Chief Judge.**

Shawn Davis appeals from his conviction for second-degree murder, contending the jury instructions were erroneous, his trial counsel was ineffective, and the court's evidentiary rulings were faulty in two respects.[1] After considering the asserted errors properly preserved, we affirm.

**I. Background Facts.**

In the early morning hours of August 5, 2017, after a night of partying with extended family, Shawn and his brother, Preston, had a physical altercation. Verbal bickering ramped up to Shawn punching Preston in the face and Preston then throwing Shawn to the ground. A third brother, Damon, pulled Preston off of Shawn. When Shawn got up off the ground, he went into his house, grabbed a knife, went back outside waving the knife over his head, and rushed toward Preston. The three brothers had a brief scramble for the knife, but Shawn retained it, stabbing at Preston and chasing Preston as he ran away. Preston ran through Shawn's backyard and jumped a fence. He collapsed in the neighbor's yard. Shawn turned around, went back into the house, and told a cousin she ought to call the paramedics because "Preston is bleeding out." Shawn then went into the basement, stripped down to his underwear and socks, threw his clothes into the washing machine, and took a shower.

Police responded to dispatch about a stabbing and arrived at Shawn's residence about 4:00 a.m. The first officer at the scene encountered Preston's wife, Crysteal, standing in the yard. She told the officer her husband needed

---

[1] Because several of the people involved have a surname of Davis, we will refer to those involved by their first names.

medical attention. When asked who had stabbed her husband, she stated it was a "friend." The officer asked if the person was still at the scene. Crysteal hesitantly told them he was in the house. Shawn was standing in the kitchen. He was cooperative when ordered to the ground and placed in handcuffs. Officers "cleared" the house. Shawn denied knowing anything about what was happening in his back yard. He later stated his two brothers were fighting outside and he had gone out and tried to break it up. Police found a bloody knife with a seven-inch blade in the kitchen sink.

When emergency responders arrived they found Preston unresponsive. An autopsy found three puncture wounds—two to the top of Preston's right shoulder that were not serious, but the third wound had severed an artery, vein, and nerve bundle in Preston's left arm, which resulted in a severe loss of blood and death.

Shawn was charged with first-degree murder, and he asserted a justification defense. At trial, Damon, Crysteal, and three cousins testified about the events of the evening and morning.

Damon testified he arrived at Shawn's at about 11:00 p.m. on August 4. He and Shawn were just visiting and drinking. Preston and Crysteal were at a community celebration, where they were going to meet up with Preston's cousins, Simmone Shingler, Iisha Hillmon, and Angela Nelson, who were visiting from Georgia. Shawn invited Preston and the others to come to his house after they left the celebration. Preston's group stopped at a lounge first and then went to Shawn's, arriving there about 2:00 a.m. on August 5.

The group congregated in Shawn's basement playing pool, dancing, and visiting. Preston, Damon, and Shawn were in a seating area of the basement,

sitting on couches and talking. Shawn "intervened" in a conversation between Preston and Damon, and then a "little spat started." Preston and Crysteal were going to leave and went upstairs. The cousins were upstairs at this time in the kitchen getting something to eat. Shawn followed Preston and Crysteal upstairs while Damon remained in the basement.

A few minutes later, Damon heard people screaming his name so he ran upstairs and out into the yard where he saw Shawn on the ground and Preston standing over him. Damon heard Preston saying, "Man, I love you." Damon testified Preston and Shawn were not touching each other. Damon grabbed Preston and pulled him away and said, "It's time to go home." Preston and Damon moved down the driveway toward Preston's car.

Shawn then came running out of the house holding a knife in the air. A scramble for the knife followed. Damon was cut on his right elbow at some time during the struggle but was not immediately aware. Shawn struck Preston in the right shoulder, and then Preston "starting running towards his car and Shawn started chasing him." Damon testified Shawn struck Preston twice more while running around the car and back towards the garage. Damon followed but Shawn turned and came at him with the knife, so Damon backed off. Damon testified Shawn continued to chase Preston waving the knife. Damon attempted to follow, and Shawn again turned and told him to "get back." Preston kept running through the back yard, hopped the fence, and then "he collapsed."

On cross-examination, Damon acknowledged he and Shawn had been drinking together and were both intoxicated. He also acknowledged that during

his deposition he had stated Shawn and Preston had their hands on each other's collars when Shawn was on the ground and Preston was standing over him.

Crysteal's and the cousins' testimony were fairly consistent with Damon's account of the events of their gathering. All stated they were drinking throughout the night. Preston was thirty-five years old at the time of his death, and Shawn was forty-nine years old. Crysteal and Preston would visit weekly with Shawn and his wife.[2] She stated Preston and Shawn had a good relationship and had similar personalities, "both being very direct-type people" who did not "sugarcoat anything." The brothers had disagreements before but had never gotten physical with one another.

Crysteal testified she drove Preston and the cousins to Shawn's, arriving about 1:30 or 2:00 a.m. They "played some pool and danc[ed] around and had a couple of drinks." People were "pretty happy and chipper in the beginning." The brothers went into other room, and she joined the cousins upstairs in the kitchen. She heard their voices getting louder so she went down to investigate. Preston told her it was "no big deal" and stopped for a minute, but then they were "bickering again." She told Preston they should leave. Preston and Shawn continued to nitpick at each other. She went up the stairs, followed by Preston and Shawn. While in the kitchen, Preston and Shawn did not talk to each other. Because she and Preston had provided the transportation, they were waiting for the cousins to eat, so they went outside into the back patio area to smoke. Shawn followed them out.

---

[2] Shawn's wife was out of town on August 4 and 5, 2017.

Crysteal testified that at this point Shawn was goading Preston to fight, while backing up into the yard. "And Preston was just standing there looking at him . . . . So Shawn comes up, snatches his chain off his neck and punches him in the mouth." Crysteal stated that normally Preston would have punched back but he just looked at Shawn, "shook his head, and attempted to turn around." But Shawn used some more provocative language and "charged him again," and "Preston charged back, had him pinned, holding him down, telling him to calm down." She stated Preston was straddling Shawn, holding his arms down. Crysteal yelled for Damon to come out. Damon separated the two, and Crysteal and Preston were going to leave. They were saying goodbye to the cousins, who decided to get an Uber later. Crysteal explained Preston was hugging the cousins and "the next thing I know, Shawn came out the back, slashing a knife in the air." Preston was taken aback, and Damon tried "to jump in the middle of it, but [Shawn] struck the knife over—where you could tell he had stabbed him in his arm." She related how Preston tried to run away and Shawn chased him, continuing to strike with the knife. She said Shawn stopped after Preston jumped over the back yard fence and fell to his knees. Then the brothers stared at each other for a time, and Shawn turned back around. Crysteal joined Preston on the other side of the fence and called 911. She was instructed to get some cloths to stop the bleeding, and when she went inside to get cloths, she noted Shawn had changed his clothes. She told Shawn he would never see them again and he responded, "I'm tired of his mouth."

Iisha was alone in the house and standing next to the kitchen sink when Shawn came inside after the altercation. Iisha testified Shawn threw the knife on the counter and told her she "might want to call the paramedics because Preston

was bleeding out." Iisha asked what he was talking about, and Shawn told her that he had been telling Preston to "stop fucking with" him. Then, Shawn went down to the basement. Iisha followed Shawn to the basement. He took off his shirt and put it in the washing machine. He had already started the machine. She followed Shawn back upstairs, and Shawn "got naked and turned on the shower." Iisha said at that point reality sank in and she ran outside, where she also jumped the fence to try to help.

Detective Brad Youngblut testified he was called to the scene at about 4:40 a.m. and interviewed a number of those present. He talked with Shawn at an interview at the police station later. During the course of interviewing Shawn, Detective Youngblut informed him Preston had died, and Shawn appeared surprised. The defense asked Detective Youngblut about a phone call Shawn made to his wife from the Polk County Jail:

> Detective Youngblut, this was a time when Shawn Davis learned he was arrested and charged for a very serious crime; correct? A. Yes.
> Q. And this is a time when he had the first conversation—after he learned that information, when he had a conversation with his wife; correct? A. I believe so.
> Q. And this was a very emotional time for them; correct? A. I would assume.
> Q. It was a traumatic event that they were undergoing, both of them; correct? A. Yes.
> Q. And he did make some statements during this—as part of being in that condition; correct? A. Yes.
> Q. And specifically when talking to his wife—
> [PROSECUTOR]: Objection, Your Honor. This question calls for hearsay.
> [DEFENSE COUNSEL]: It does, Your Honor, but I think I've laid foundation for an excited utterance.

The jury was excused, and the court heard arguments from counsel. The defense made an offer of proof that upon learning of the charge, Shawn called his

wife and stated, "He'd kill me. He'd kill me. He'd kill me." Defense counsel could not give a precise time frame for when the call was made but stated it was upon Shawn's learning he was charged with first-degree murder.

The court ruled:

> So, [defense counsel], I'll give you a chance here if you want to talk with this witness to lay some additional foundation.
> I think right now, I don't think that statement, in talking with his wife after he's been charged with murder, carries the reliability that our rules allow for an excited utterance or a statement of physical or mental condition under 803.(3) and 803(2), but I will allow to you lay additional foundation with this witness.

The defense was not able to lay a proper foundation.

Shawn testified in his own defense. He noted he was five foot seven inches and weighed about 177 pounds; Preston was younger, taller, and weighed 260 pounds. Shawn testified he worked as a dump truck driver and had worked a full day on August 4, 7:30 a.m. to 5:30 p.m. When he got home, his plan was to work on his yard and have a few drinks. Damon came over before the others, and the two of them traded some workout equipment and then sat in the back yard having some drinks. He invited the others to join them.

Shawn stated that after Preston, Crysteal, Iisha, Angela, and Simmone had been at his house for a time, he went to the basement TV room. He was getting tired and wanted to sit on one of the sofas and eventually fall asleep there. Damon and Preston came in and they were all talking. Shawn and Preston had a disagreement while they were in the TV room. Shawn stated that "Preston always . . . had a way of saying little stuff. Like he would insinuate or—he would just be slick, especially when he drinks . . . and he just started doing that and it started an argument." Preston made comments that he was the "boss" and the "honcho and

stuff like that." Then, Shawn and Preston started to bicker. Shawn testified that he decided to walk away from the bickering and go outside to smoke a cigarette. He went upstairs, as did Crysteal and Preston. The three cousins were already upstairs getting something to eat.

Shawn testified that he used the restroom then went outside to smoke a cigarette. Crysteal followed him outside a short time later. A few minutes later, Preston also came out and "started it again." Preston was "jugging" at Shawn, "agitating" him. Shawn testified the argument "started to get heated," the two were "disrespecting" each other and "fighting words" were exchanged. Shawn knew he and Preston were about to fight.

Shawn testified that he was standing on the patio with his back to the table and Preston came down the stairs to the patio and towards him. Shawn testified Preston was being aggressive. Crysteal got between them, but Preston moved Crysteal to the side, and Shawn thought Preston was coming to fight. As soon as Preston got around Crysteal, Shawn swung and hit Preston in the jaw. He stated that his back was to the table, and when his younger and bigger brother came at him in an aggressive manner, he felt threatened, and he hit Preston to defend himself.

Shawn testified he then found himself on his back and Preston was on top of him, choking him. He stated Preston had slammed him to the ground on the brick patio. He felt disoriented and "lost focus for a minute." Preston was holding him down. Shawn testified, "[t]hat was some uncharted territory for Preston and I." He state he was "bewildered," "afraid," and "angry." And he was wondering whether Preston was trying to kill him.

Damon appeared and pulled Preston off Shawn. Shawn testified that he went inside and grabbed a knife to scare Preston away from his house. He testified that he just wanted Preston to leave because it did not appear to him that Preston was leaving on his own accord. Shawn acknowledged that he could hear Crysteal hollering "Let's go," but testified that Preston does not listen to Crysteal and he still felt threatened.

Shawn denied that he intended to stab or kill Preston when he went outside. He stated he was waving the knife in the hope that Preston would see it and would just take off.

When Shawn got to the driveway, he testified Damon and Preston ran towards him and grabbed him and they wrestled for control of the knife. Shawn stated that he did not know what was going on and he felt threatened. Shawn testified that if Preston had backed off and run away and left Shawn's house when he saw the knife, he would not have chased him. Shawn testified that he did not remember stabbing Preston but admitted that he was the only person with a knife and that he must have stabbed Preston in the course of the scuffle. When Preston took off running, Shawn realized that he had stabbed him. He said he was not chasing Preston after that time but he followed him to the patio and stopped there.

On cross-examination, Shawn acknowledged that when he went into the kitchen he could have stayed inside and he could have locked the doors. He also stated he was not scared when he went back outside.

The court prepared proposed jury instructions. The defense objected to a proposed instruction concerning intoxication because they had not raised an

intoxication defense.[3] The court proposed only one sentence be included: "The fact that a person is under the influence of alcohol does not excuse or aggravate his guilt." The defense stated, "We would be fine with that." After further discussion, the court observed the "pervasive use of alcohol throughout and the themes of the questioning . . . there was a lot of mention of alcohol during the testimony."

The defense also objected to the inclusion of language in the justification instruction, "the defendant was not justified [if a]n alternative course of action was available." Counsel argued it was incorrect statement of the law following the legislature's recent amendment colloquially called the right to "stand your ground."[4]

---

[3] The Iowa State Bar Association Criminal Jury Instruction 200.14 states:
> The defendant claims [he] [she] was under the influence of [intoxicants] [drugs] at the time of the alleged crime. The fact that a person is under the influence of [intoxicants] [drugs] does not excuse nor aggravate [his] [her] guilt.
>
> Even if a person is under the influence of an [intoxicant] [drug], [he] [she] is responsible for [his] [her] act if [he] [she] had sufficient mental capacity to form the specific intent necessary to the crime charged or had the specific intent before [he] [she] fell under the influence of the [intoxicant] [drug] and then committed the act. Intoxication is a defense only when it causes a mental disability which makes the person incapable of forming the specific intent.

[4] Iowa Code section 704.1 was amended as follows:
> 1. "Reasonable force" ~~is~~ means that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat. ~~Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk of life or safety, or the life or safety of a third party, or requires one to abandon or retreat from one's dwelling or place of business or employment.~~
>
> 2. A person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a

After discussion, the court found that "an alternative course could be much broader than just retreat" and kept the language in Instruction 33. The court noted Instruction 37 provided further instruction concerning the duty to retreat.

In closing argument, the defense argued Shawn "was not doing anything illegal but being home. And he had no duty to retreat. There was not a reasonable alternative course of action[.]" In the alternative, the defense argued that if the jury found his actions were not justified, then it was not murder but voluntary manslaughter—an act of passion resulting from a serious provocation of having been thrown to the ground and choked.

The jury found Shawn guilty of second-degree murder. He filed a motion for new trial based on the inclusion of alternate-course-of-action language, citing this court's newly filed opinion in *State v. Lorenzo Baltazar*. No. 18-0677, 2019 WL 2144682, at *3 (Iowa Ct. App. May 15, 2019) (finding trial counsel was ineffective in failing to object to justification instruction that included the alternative-course-of-action language in light of new legislation and reversing the defendant's first-degree murder conviction for a new trial). The district court distinguished the case and denied the motion.

Shawn appeals, claiming errors in the jury instructions and the court's evidentiary rulings.

---

reasonable basis for the belief of the person and the person acts reasonably in the response to that belief.

3. A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter.

2017 Iowa Acts ch. 69, § 37.

**II. Jury Instructions.**

"We . . . review challenges to jury instructions for correction of errors at law." *State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018). "We do not consider an erroneous jury instruction in isolation, but look at the jury instructions as a whole." *State v. Murray*, 796 N.W.2d 907, 908 (Iowa 2011).

*A. Alternate Course of Action.* Our supreme court granted further review of this court's ruling in *Lorenzo Baltazar* and vacated the relevant portion. 935 N.W.2d 862, 869 (Iowa 2019). The court noted, "Justification is a statutory defense that permits a defendant to use reasonable force to defend himself or herself." *Id.* The supreme court noted the statutory provision recognizes that the "implied duty to follow an alternative course of action [is] a disqualifying factor for justification." *Id.* at 870. After discussing some of the historical context, the court explained, "We agree the 2017 amendment changed—*but did not eliminate*—the implied duty to follow an alternative course of action." *Id.* (emphasis added). The specific issue presented was whether Lorenzo Baltazar had a duty to retreat under the circumstances of that case. *See id.* "If there is no duty to retreat when a person is not engaged in illegal activity or lawfully present, then by implication the duty to retreat remains if the activity is illegal or the presence unlawful." *Id.* The supreme court held that, because Lorenzo Baltazar was engaged in an illegal activity, he was disqualified from asserting his justification. *Id.* at 871.

On appeal, Shawn argues that unlike Lorenzo Baltazar he "was not involved in any illegal activity and he was lawfully present at his own home." He asserts he thus had no duty to retreat and the inclusion of the "alternative course of action" instruction was given in error, requiring a new trial. *See id.* at 871–72 (noting we

presume prejudice if the instructional error is preserved).  We believe the defense reads the *Lorenzo Baltazar* ruling too narrowly in equating an alternative course of action only with the duty to retreat.

The State asserts that "[w]hile the amendment to section 704.1 expanded the situations in which one is not required to retreat, it did not change Iowa case law that makes a justification defense unavailable where, as here, the defendant had an alternative course of action that did not require him to retreat."  We agree. Retreat may be one alternative course of action, but there may be others.  As the district court observed during arguments, "But how is alternative course necessarily tied to a duty to retreat?  I mean, isn't an alternative course that you can call the police or you could—I mean, does it necessarily tie to retreat?" Defense counsel acknowledged "alternative course of action clearly means to run away or do something—or do anything, short of defending yourself or standing your ground."  Shawn acknowledged he could have stayed inside and he could have locked the doors.

The fundamental question for the jury as factfinder was to determine whether the defendant's actions were justified.  It was for the jury to determine whether "a reasonable person" would find Shawn's actions of taking a knife and running outside toward Preston necessary under the circumstances to prevent death or injury.  The evidence presented warranted inclusion of the jury instruction on the alternative course of action.

*B. Incomplete Instruction.*  Shawn contends the jury instructions did not adequately explain the exceptions to the duty to pursue an alternative course of action.  However, this claim was not made to the trial court and is thus raised as a

claim that trial counsel were ineffective in failing to object to the instruction given.[5]

We review ineffective-assistance-of-counsel claims de novo. *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016).

The jury was given these instructions relevant to justification and the duty to pursue an alternative course of action:

> INSTRUCTION NO. 31
>
> The defendant, Shawn Eugene Davis claims he acted with justification.
>
> A person may use reasonable force to prevent injury to a person, including the defendant.
>
> The use of this force is known as justification.
>
> Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury.
>
> A person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.
>
> The State must prove the defendant was not acting with justification.
>
> INSTRUCTION NO. 33
>
> A person is justified in using reasonable force if he reasonably believes the force is necessary to defend himself from any actual or imminent use of unlawful force.
>
> If the State has proved any one of the following elements, the defendant was not justified:
>
> 1. The defendant started or continued the incident which resulted in death.
>
> 2. An alternative course of action was available to the defendant.
>
> 3. The defendant did not believe he was in actual or imminent danger of death or injury and the use of force was not necessary to save him.

---

[5] In 2019, the legislature amended Iowa Code section 814.7 to prohibit appellants from bringing ineffective-assistance claims on direct appeal. *See* 2019 Iowa Acts ch. 140, § 31. However, because the district court entered judgment against Shawn prior to the amendment's effective date, it does not apply and we may consider his claim on direct appeal. *See State v. Macke*, 933 N.W.2d 226, 235 (Iowa 2019).

4. The defendant did not have reasonable grounds for the belief.

5. The force used by the defendant was unreasonable.

INSTRUCTION NO. 37

Concerning element number 2 of Instruction No. 33, if a defendant is confronted with the use of unlawful force against him, he is required to avoid the confrontation by seeking an alternative course of action before he is justified in repelling the force used against him. However, there is an exception.

If the defendant was not engaged in illegal activity and the alternative course of action involved retreating from a place where the defendant was lawfully present, then he was not required to take or use the alternative course of action to avoid the confrontation, and he could repel the force with reasonable force (including deadly force).

In his appellate brief, Shawn contends trial counsel was ineffective in failing to object to Instruction 37 because it did not adequately explain:

Shawn Davis was in his own home, which he was legally occupying, he would have had to leave his own home in order to retreat, which he was not required to do. This allowed him to repel force with reasonable force.

. . . If the alternative course of action involved a risk to his life or safety, as he reasonably believed, he had no duty to use an alternative course of action to avoid the confrontation and could repel with deadly force.

To prevail on his claim of ineffective assistance of counsel, Shawn must prove: "(1) counsel failed to perform an essential duty, and (2) prejudice resulted from this failure." *Lorenzo Baltazar*, 935 N.W.2d at 868. "Failure to prove either prong is fatal to an ineffective-assistance-of-counsel claim." *Id.*

Shawn has failed to prove prejudice. *See id.* at 869 ("To establish prejudice under the second prong, a defendant must show a reasonable probability that the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (internal quotation marks and citations omitted)). There is no evidence Preston approached the

house after Shawn went inside. There is no evidence it was necessary for Shawn to arm himself for protection when Preston was outside and half-way down the driveway. In addition, Shawn testified he was not afraid when he left the house with the knife. It was Shawn who approached Preston as he was leaving. There is no reasonable probability the result of the trial would have been different had the jury instructions included the additional language. In light of the facts of this case, Shawn cannot show prejudice.[6]

*C. Intoxication.* Shawn next contends it was error for the court to include any portion of the intoxication instruction. This claim was waived by trial counsel's statement, "We would be fine with that." *See State v. Schmidt,* 312 N.W.2d 517, 518 (Iowa 1981) (noting a defendant "cannot both object and consent to evidence if he expects to preserve error for appeal.").

**III. Evidentiary Rulings.**

*A. Excited Utterances.* The defense sought to admit Shawn's statements to his wife on a jail call, "He'd kill me. He'd kill me. He'd kill me." Counsel acknowledged the statements were hearsay but argued they were admissible as excited utterances. On appeal, Shawn asserts the court was improperly "fixated" on the reliability of the statements.

---

[6] In his reply brief, Shawn also contends the instructions failed to explain "a person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a reasonable basis for the belief of the person and the person acts reasonably in the response to that belief." Iowa Code § 704.1(2). We do not consider issues first raised in a reply brief. *See Villa Magana v. State*, 908 N.W.2d 255, 260 (Iowa 2018). In any event Instruction 34 states: "[T]he defendant was not required to act with perfect judgment. . . . If in the defendant's mind the danger was actual, real, imminent or unavoidable, even though it did not exist, that is sufficient if a reasonable person would have seen it in the same light."

"Although we normally review evidence-admission decisions by the district court for an abuse of discretion, we review hearsay claims for correction of errors at law." *State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016). "'[T]he question whether a particular statement constitutes hearsay presents a legal issue,' leaving the trial court no discretion on whether to admit or deny admission of the statement." *Id.* (alteration in original) (citation omitted).

Hearsay is "a statement that: (1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). Generally, hearsay is not admissible unless it falls within an exception to the hearsay rule. *State v. Veverka*, 938 N.W.2d 197, 199 (Iowa 2020). "[A] district court 'has no discretion to admit hearsay in the absence of a provision providing for it.'" *Id.* at 202 (citation omitted). The proponent of the evidence has the burden to establish the testimony comes within an exception to the rule. *State v. Walker*, 935 N.W.2d 874, 879 (Iowa 2019).

An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Iowa R. Evid. 5.803(2). "The rationale behind the exception is that statements made under the stress of excitement are less likely to involve deception than if made upon reflection or deliberation." *State v. Tejeda*, 677 N.W.2d 744, 753 (Iowa 2004).

> The application of the exclusion lies largely within the discretion of the trial court, which should consider (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of

the event being described, and (5) the subject matter of the statement.

*Id.* at 754 (quoting *State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999)). These factors all provide context as to why the statement would (or would not) be reliable.

The district court engaged defense counsel in rather extensive argument about the application of the exclusion:

> THE COURT: I mean, that's a pretty self-serving piece of hearsay that would be coming in. That's why, I guess, I want to really get clear on this. I know you're arguing that an excited utterance doesn't have to be close in time to the event, but I mean, you know, he's talking to his wife. So I guess I'm trying to get at the reliability of this, so date, time. I mean, are you saying this is the first call he's making to his wife?
>
> [DEFENSE COUNSEL] MR. RODRIGUEZ: That is my understanding, Your Honor.
>
> THE COURT: And how far after the event did it take place?
>
> MR. RODRIGUEZ: It would have been the same day when he was arrested and processed at the Polk County Jail, which would have been August 5th.
>
> THE COURT: So he's not observing a startling event. He's going to be talking to his wife about something—some event that had occurred previously; correct?
>
> MR. RODRIGUEZ: Yes, but he's still suffering from the effects of a traumatic event that occurred.
>
> . . . .
>
> THE COURT: And I guess, Mr. Rodriguez, the reason I was concerned about the timing of the event is: The jury was able to see a video of Mr. Davis handcuffed on the ground, talking, I mean, right after the event. And it seems to me if he would have yelled out, "He threatened to kill me," or "He was going to kill me," or—I forget your exact words, I apologize. But that seems like that would be a spontaneous—I guess that's what I'm trying to figure out, how far removed this phone call to his wife is as opposed to him at the house right after the event when a lot of people are there speaking to him.
>
> MR. RODRIGUEZ: Clearly it was not at the crime scene, Your Honor. And it was hours after the incident, admittedly. I don't know how many—and I don't know that we can establish through Detective Youngblut the exact time and location. And we know the location, but not the exact time.
>
> THE COURT: And I'm not making a determination whether it's credible or not. I'm looking for reliability. Because, ultimately, I think

it's my job to determine whether it is an excited utterance or present sense impression under our rules.

And, Mr. Rodriguez, I would like you to be heard on the State's contention, through the case they cited and through the rule they are saying, that they can bring in collateral evidence to attack the credibility of your client.

MR. RODRIGUEZ: Your Honor, I think what that rule relates to is if a statement is entered and then the witness does not testify, then the State can attack the credibility of that individual through extraneous evidence.

. . . .

THE COURT: So you can kind of tell I'm a little skeptical about your excited utterance or present sense impression arguments.

Explain to me again how that statement to his wife, after his arrest—because we're talking about after his arrest, after he's been read his rights, after he's been informed of the charge.

MR. RODRIGUEZ: Yes.

THE COURT: And is that the traumatic event, is that he's being charged with murder?

MR. RODRIGUEZ: Yeah, that's part of it. He was involved in this event and he's a suspect and he's been told he's a suspect. But more than that, he's been told that he is being charged with murder in the first degree.

And his first opportunity. Still part of the same emotional trauma that he's going through. It's aggravated because it's the first conversation with his wife where he informs her of his situation and he's still suffering the effects of that traumatic event.

THE COURT: The traumatic event of being told he's being charged with murder as opposed to killing his brother?

MR. RODRIGUEZ: Yes.

THE COURT: Anybody have any case law on that? Because, once again, you know, I'm trying to look for reliability, not credibility. Obviously, I'm sure that was an emotional event. But in terms of reliability, we're looking at, you know, the occurrence or the event was so startling to render the normal reflective thought process of an observer.

I mean, his thought process is: All right. I've just been charged with a very serious crime. I'm thinking that takes it outside the scope of being reliable and more towards being more self-serving, especially coming through this witness. And I could be wrong, Mr. Rodriguez. I am trying to understand your position so we can make a good ruling on this.

[PROSECUTOR]: Your Honor, I'd also add that the statement that they are trying to introduce is not about being charged with murder; it's about the murder itself that happened hours before. So he's not excited about the event that just occurred. That's the reliability of truthfulness that the hearsay exceptions are designed.

The statements are allowed to come in through exceptions because there's a reliability of truthfulness.

Because they are made in this excited state about the event that is happening at that time, I agree with the court, this is a self-serving statement about a previous event that occurred hours before.

And the foundation that's been laid so far is simply that the defendant was emotional. There's been no testimony about anything being excited about him whatsoever, simply that he was emotional.

We find no error in the court's ruling that a self-serving statement made at an unspecified time after the stabbing failed to constitute an excited utterance. *See State v. Veal*, 564 N.W.2d 797, 808 (Iowa 1997) (finding the court did not err in excluding Veal's statements, which were not in response to a startling event and were "not spontaneous, as required for the excited utterance exception"), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249, 254 (Iowa 1998).

*B. Video of Defendant in Handcuffs.* Shawn also contends the court abused its discretion in allowing the jury to view Exhibit 20, a bodycam video recording of the responding police officer encountering Shawn, which includes Shawn laying on the ground in handcuffs. Shawn contends the bodycam video was unduly prejudicial.

Rulings on the admission or exclusion of evidence are reviewed for an abuse of discretion. *See State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019). "An abuse of discretion will be found when the court exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable." *State v. Smith*, 522 N.W.2d 591, 593 (Iowa 1994). "'[W]e grant the district court wide latitude regarding admissibility' and will reverse only where the losing party was prejudiced by an unreasonable decision." *Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 5 (Iowa

2001) (alteration in original) (quoting *State v. Sallis*, 574 N.W.2d 15, 16 (Iowa 1998)).

Relevant evidence is generally admissible. Iowa R. Evid. 5.402. "Evidence is relevant if: [(1) i]t has any tendency to make a fact more or less probable than it would be without the evidence; and [(2) t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Iowa R. Evid. 5.403.

Here, the district court acknowledged the defense argument that the "matters can be brought in through audio and through the testimony of the officers that were there," but found the video relevant due to the timing and location of the events and the statements made by the defendant. And the court found the video had probative value, noting the video contained "quite a bit of relevant evidence based on what the defendant was wearing, what his statements were to the officers, his demeanor." The court then weighed that quite-probative evidence against the danger of unfair prejudice:

> I think that when we look at the unfairly prejudicial issues, whether it would appeal to the jury's sympathy or horror, or the instinct to punish, I think the video in itself can be remedied with an instruction.
>
> And we do have that standard instruction that talks about the nature of the defendant, his presumption of innocence. We will continue to maintain his presumption of innocence.
>
> And it appears that the circumstances of that arrest and the context of his location and statements will be a big part of the State's case.
>
> I think the jury understands the defendant was arrested and that it would be natural for the police to ask questions when there was a stabbing at his house or in his backyard or somewhere on the residence.

"Because the weighing of probative value against probable prejudice is not an exact science, we give a great deal of leeway to the trial judge who must make this judgment call." *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006). The court's reasons were neither clearly untenable or clearly unreasonable. The court did not abuse its discretion.

For all the reasons stated, we affirm.

**AFFIRMED.**