# IN THE SUPREME COURT OF IOWA

No. 21–0158

Submitted January 20, 2022—Filed April 1, 2022

**STATE OF IOWA,**

Appellee,

vs.

**ANTOINE TYREE WILLIAMS,**

Appellant.

---

Appeal from the Iowa District Court for Floyd County, Rustin Davenport, Judge.

The defendant appeals the district court's denial on remand of his motion challenging the representativeness of the jury pool under the fair-cross-section requirements under the Sixth Amendment to the United States Constitution. **AFFIRMED.**

McDermott, J., delivered the opinion of the court, in which all justices joined. Appel, J., filed a special concurrence.

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellant Defender, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven and Scott Brown, Assistant Attorneys General, for appellee.

**McDERMOTT, Justice.**

A jury in Floyd County found Antoine Williams, an African-American man, guilty of second-degree murder. Williams appealed his conviction, arguing that his right to an impartial jury under the United States Constitution and the Iowa Constitution had been violated because his jury pool only contained two African-American jurors, one of whom was later excused because she was a college student. On appeal, we remanded the case to give Williams an opportunity to develop his impartial-jury arguments in response to refinements that we made to how a defendant must prove a fair-cross-section constitutional violation that we explained in his and other cases after his trial. The district court ultimately rejected Williams's further-developed claims. Williams now appeals that ruling.

## I. Facts Developed on Remand.

We described the underlying facts from Williams's trial and earlier procedural history of this case in the opinion filed in Williams's initial appeal and will forego restating them here. *See State v. Williams* (*Williams I*), 929 N.W.2d 621, 623–28 (Iowa 2019). Pertinent to this appeal are the facts that the parties developed on remand related to the only remaining issue in the case: Williams's fair-cross-section claim.

In *State v. Plain* (*Plain II*), we defined the terms "jury pool" (the members of the community selected for jury duty and summoned and reporting to the courthouse), "jury panel" (the members of the pool directed to a particular courtroom to serve as possible jurors for a specific trial), and "jury" (the members

of the panel actually selected for a specific trial), and will use the same definitions in this case. 969 N.W.2d 293, 294–95 (Iowa 2022).

At the time of Williams's trial, the jury manager in Floyd County would send members of the jury pool a paper questionnaire for the juror to provide basic information relevant to the jury selection process. That questionnaire left it optional for jurors to identify their race. If a prospective juror didn't return the questionnaire, the jury manager would send a reminder letter. If the summoned juror failed to appear at the courthouse on the date shown on the summons, the jury manager would send the juror a failure-to-appear notice. Failing to appear subjected the summoned juror to being found in contempt of court. But contempt hearings were rare in Floyd County; those who failed to appear were usually deferred to another trial date or not further contacted.

Williams's jury pool could have included up to 138 potential jurors, of which two were African-American. It was the jury manager's practice to excuse summoned jurors who, according to their questionnaire responses, were students. (Other age-related or hardship-related requests to be excused from jury service were left to the judge to resolve.) One of the African-American jurors in the group of 138 responded on the questionnaire that she was a student attending college outside Floyd County. The jury manager excused her because she was a student. This left only one African-American juror at the courthouse that day.

On remand to address his fair-cross-section challenge, Williams called several witnesses. Todd Nuccio, the state court administrator at the time of the

hearing, testified about statewide changes to the jury management practices implemented in December 2018 and aimed in part to address issues raised in our decisions in *Plain I, Lilly I, Veal I,* and *Williams I. See State v. Plain* (*Plain I*), 898 N.W.2d 801, 827–28 (Iowa 2017); *State v. Lilly* (*Lilly I*), 930 N.W.2d 293, 305–07 (Iowa 2019); *State v. Veal* (*Veal I*), 930 N.W.2d 319, 328–29 (Iowa 2019); *Williams I*, 929 N.W.2d 621 at 629–30. The changes included creating uniform jury management practices in summoning prospective jurors, addressing failures to appear or respond, establishing procedures for reminder letters and electronic notifications, implementing electronic (as opposed to paper) juror questionnaires, and publicizing the source list from which courts draw jury pools. Before the changes, it was optional for jurors to identify their race on the questionnaire; now it's required. Nuccio testified that he lacked sufficient data to say whether the changes had increased representation but that anecdotal information suggested it was improving.

Mark Headlee, the judicial branch's information technology director, testified about the jury management software that courts throughout the state use. He explained that the judicial branch receives voter registration, driver's license, and non-operator identification lists that are combined (with duplications removed) to form the source list from which people are randomly selected for jury pools. *See* Iowa Code §§ 607A.21–.22.

Grace Zalenski, a private statistical consultant, testified about her analysis of the racial composition of Williams's jury pool and Floyd County's historical data for jury pools in the year preceding Williams's trial. She analyzed

two sets of data: one that included the African-American college student who had been excused and one that didn't. Finding the sample size of Williams's own jury too small to run a statistically-valid calculation, Zalenski focused instead on the historical data and found an underrepresentation of African-Americans on Floyd County jury pools that, based on her calculations, couldn't be attributed to random chance.

The court also heard testimony from Mary Rose, an associate professor of sociology at the University of Texas at Austin, who described her areas of expertise to include jury decision-making, jury representation, and jury participation. Rose identified several factors based on her research that were associated with the underrepresentation of African-Americans and Hispanics on juries, including laws excluding felons from serving, failing to issue reminders to summoned jurors, and failing to impose consequences for summoned jurors who don't show.

## II. The *Duren/Plain* Elements.

The Sixth Amendment to the United States Constitution guarantees the right to "an impartial jury of the state and district wherein the crime shall have been committed." U.S. Const. amend VI. The Iowa Constitution similarly guarantees the right to a "trial by an impartial jury." Iowa Const. art. I, § 10. The constitutional guarantees of an impartial jury entitle the accused to a jury "drawn from a fair cross-section of the community." *Plain I*, 898 N.W.2d at 821.

A defendant establishes a prima facie violation of the fair-cross-section requirement by showing that (1) a group alleged to have been excluded is a

"distinctive" group in the community, (2) the group's representation in jury pools is not "fair and reasonable" when considered against the group's percentage in the community, and (3) the group's underrepresentation "is due to systematic exclusion of the group in the jury-selection process." *Id.* at 822 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). The defendant bears the burden of proof to show a prima facie violation of the fair-cross-section requirement. *Plain I*, 898 N.W.2d at 821–22; *Lilly I*, 930 N.W.2d at 299; *see also Duren*, 439 U.S. at 363–64.

The State concedes the first *Duren/Plain* prong that African-Americans constitute a distinctive group in the community. The contest involves the second and third prongs. The district court held that Williams's claim failed on either ground. We review challenges alleging the denial of constitutional rights—in this case, the right to an impartial jury—de novo and thus evaluate the evidence anew without deferring to the district court's findings. *Williams I*, 929 N.W.2d at 628.

**A. The Scope of the Remand and Our Review on Appeal.** On remand, Williams asked the district court to evaluate his claims under both the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. In *Williams I*, we held that Williams hadn't raised a claim under the Iowa Constitution in the district court as required before his trial. *Id.* at 629–30 nn.1–2. We thus limited the remand to his claims under the Sixth Amendment. *Id.* at 630, 638. The district court on remand determined that Williams hadn't preserved a fair-cross-section challenge under the Iowa Constitution, and the district court didn't rule on the claim because it found the

issue exceeded the scope of our remand order. Williams concedes in this appeal that error wasn't preserved on a challenge under article I, section 10 of the Iowa Constitution. We thus will address Williams's claims under the Sixth Amendment to the United States Constitution only.

**B. William's Proof of Causation under *Duren/Plain*'s Third Prong.** We will begin our analysis on the third prong, since an inability to establish any one of the three *Duren/Plain* elements is fatal to a defendant's fair-cross-section challenge. To establish the third prong, a defendant must prove that the underrepresentation resulted from a particular feature (or features) of the jury selection system. *Plain I*, 898 N.W.2d at 823–24. The defendant, in other words, "must establish the exclusion is 'inherent in the particular jury-selection process utilized' " and show that the practice caused the systematic exclusion of the distinctive group in the jury selection process. *Id.* at 824 (quoting *Duren*, 439 U.S. at 366).

Williams challenges four jury management practices as the "cause" of the alleged underrepresentation: (1) failing to use more than the voter registration list to summon jurors for the pool, (2) failing to sufficiently enforce penalties for summoned jurors' failures to appear, (3) failing to promote responsiveness by using an online summons and reminder system, and (4) failing to summon jurors using a randomized process. As evidence of causation, Williams points out that representation of African-Americans in jury pools improved in Floyd County after statewide changes in 2018 to jury management practices touching most of these subjects. Williams also suggests (without elaboration) that the jury manager's

practice of excusing college students also constitutes a practice that results in the systemic exclusion of African-Americans.

In *Veal I*, we held that to prove a Sixth Amendment fair-cross-section violation, the defendant "must identify some practice or combination of practices that led to the underrepresentation, and it must be something other than the 'laundry list' the Supreme Court declined to condemn" in *Berghuis v. Smith*. 930 N.W.2d at 330 (quoting *Berghuis v. Smith*, 559 U.S. 314, 332 (2010)). Challenges to "run-of-the-mill" jury management practices, we said, are insufficient to show systematic exclusion under the Sixth Amendment. *Id.* at 329; *Plain II*, 969 N.W.2d at 297. We described run-of-the-mill jury management practices in *Lilly I* as the "relatively commonplace" practices that might include, for instance, "the updating of address lists, the granting of excuses, and the enforcement of jury summonses." *Lilly I*, 930 N.W.2d at 308. These common jury practices fall within a state's "broad discretion," according to the Supreme Court in *Berghuis*, and will not sustain a cross-section challenge under the Sixth Amendment. *Berghuis*, 559 U.S. at 333 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 537–38 (1975)); *see Plain II*, 969 N.W.2d at 297–98.

At least two of the practices that Williams advances as causing the alleged systematic exclusion not only meet the definition of a "run-of-the-mill jury management practice" that we set out in *Lilly I*, but are the very examples we provided of such practices. *Lilly I*, 930 N.W.2d at 308. Williams's claim that Floyd County failed to hold jurors accountable through enforcement proceedings for not responding or appearing, and granted excusals to summoned jurors

attending college, thus don't help him. They are, by straightforward application of our own illustrations, run-of-the-mill practices that we previously said will *not* constitute evidence of causation. *See Plain II*, 969 N.W.2d at 298.

As to Williams's challenge that the court used only voter registration lists to construct a source list from which to draw jury pools, he fails to recognize that at the time of his trial Floyd County was already using not only the voter registration list but also the motor vehicle operator list and nonoperator identification list to construct the source list. "The practice of using the state's own voter registration list, motor vehicle operator list, and nonoperator identification list to construct a source list from which to draw jury pools," we recently held in *Lilly II*, "amounts to a commonplace, run-of-the-mill practice." *State v. Lilly* (*Lilly II*), 969 N.W.2d 794 (Iowa 2022).

As to Williams's claims about reminders to summoned jurors, we similarly have already held that practices for reminding summoned jurors who haven't responded "falls within the category" of run-of-the-mill. *Plain II*, 969 N.W.2d at 298. On his complaint about using paper questionnaires as opposed to an online offerings, we find such a practice sufficiently commonplace to fit within a state's broad discretion. *See Berghuis*, 559 U.S. at 332. Finally, as to Williams's claim that prospective jurors weren't summoned using a randomized process, he presented no evidence whatsoever to prove such an assertion.

Because Williams failed to deliver on his burden under the third prong, which on its own is sufficient to affirm the district court's denial of his claim, we

need not take up his arguments relating to the second prong's requirement to establish actual underrepresentation of African-Americans in his jury pool.

Williams argues, in the alternative, that our refusal to consider run-of-the-mill jury management practices to establish the third prong's systemic exclusion under the Sixth Amendment hinges on a misreading of *Berghuis*, and he asks us to overrule our holding in *Veal I* on this point. For the same reasons that we set forth in *Plain II*, 969 N.W.2d at 298–99, we find no error in our prior interpretation or current application of *Duren* and *Berghuis* to bar Sixth Amendment challenges that allege systemic exclusion as a consequence of run-of-the-mill jury management practices.

### III. Conclusion.

In *Williams I*, we conditionally affirmed Williams's conviction and remanded for a determination on his fair-cross-section challenge. We now affirm the district court's holding on remand that Williams failed to prove a violation of his Sixth Amendment right to an impartial jury, and affirm his conviction.

**AFFIRMED.**

All justices join this opinion. Appel, J. files a special concurrence.

**APPEL, Justice (concurring specially).**

Two separate constitutions support the right of a criminal defendant to a fair cross-section in the jury venire in a criminal case: the Sixth Amendment to the United States Constitution, and article I, section 10 of the Iowa Constitution.

The constitutional right to a fair cross-section in the venire in a criminal trial advances several significant goals. Primarily, it serves the critical purposes of guarding against the exercise of arbitrary power and making available the common-sense judgment of the community. *See Commonwealth v. Soares*, 387 N.E.2d 499, 511 (Mass. 1979), *abrogated in part on other grounds by Commonwealth v. Robertson*, 105 N.E.3d 253, 265 n.10 (Mass. 2018). As I have previously observed, "When an identifiable segment of the community is excluded from a jury, the effect is to remove from the jury the range of human experience and its unique perspective on human events." *State v. Lilly*, 930 N.W.2d 293, 311 (Iowa 2019) (Appel, J., concurring specially) (citing *Peters v. Kiff*, 407 U.S. 493, 503–04 (1972)).

Further, participation of all segments of the community in the jury system promotes the legitimacy of the criminal justice system itself. In Iowa, the legitimacy of our criminal justice system is subject to question in light of the gross racial disparities in our criminal justice system. *See State v. Plain*, 898 N.W.2d 801, 830 (Iowa 2017) (Wiggins, J., concurring specially) (citing statistics showing African-Americans make up only 3.1% of the Iowa population but 25.8% of Iowa's prison population); *see also* Derek W. Miller, Note, *Discrimination,*

*Discretion, and Iowa's Packed Prisons*, 105 Iowa L. Rev. 901, 904–07 (2020); Alfredo Parrish, *Racial Disparity in Iowa's Criminal Justice System 150 Years After Clark*, 67 Drake L. Rev. 251, 254–55 (2019). Such gross racial disparities have the potential to undermine the widespread community support necessary for effective law enforcement.

In considering fair-cross-section challenges under the Sixth Amendment to the United States Constitution, the United States Supreme Court has established the familiar three-part test in *Duren v. Missouri*. *See Duren v. Missouri*, 439 U.S. 357, 364 (1979). But the Court has declared that "run-of-the-mill" jury practices are essentially carved out of the analysis. *See Berghuis v. Smith*, 559 U.S. 314, 332 (2010). For purposes of the Sixth Amendment, the United States Supreme Court cases on this point are binding. *See State v. Veal*, 930 N.W.2d 319, 330 (Iowa 2019); *Plain*, 898 N.W.2d at 823–24 (majority opinion). As a result, we must reject the fair-cross-section challenges in this case based on run-of-the-mill jury practices under the Sixth Amendment.

That said, I have difficulty grasping how run-of-the-mill jury practices should be somehow carved out of the fair-cross-section analysis if it can be shown that such practices cause systematic exclusion of a discrete group of the population from our juries. No doubt many run-of-the-mill practices are efficient, but the jury trial itself, of course, is a wonderfully inefficient process that promotes important constitutional values. And, in *Lilly*, we recognized that under certain circumstances, run-of-the-mill jury practices can be shown to create systematic disparity sufficient to support a fair-cross-section claim. 930 N.W.2d

at 308 (majority opinion) ("[W]e hold today that run-of-the-mill jury management practices such as the updating of address lists, the granting of excuses, and the enforcement of jury summonses can support a systematic exclusion claim where the evidence shows one or more of those practices have produced underrepresentation of a minority group.").

Our jurisprudence on fair-cross-section claims under the Iowa Constitution is still developing. We rejected the absolute disparity test in *Plain* and *Lilly*. *See Lilly*, 930 N.W.2d at 299; *Plain*, 898 N.W.2d at 826. And we further embraced the notion that run-of-the-mill jury practices, upon a proper showing, may give rise to a fair-cross-section claim under article I, section 10 of the Iowa Constitution. *See Veal*, 930 N.W.2d at 328 (noting that run-of-the-mill jury management practices under certain circumstances can constitute systematic exclusion); *Lilly*, 930 N.W.2d at 308 (same). There may be more developments to come. In particular, I am not sure that requiring the defendant to carry the burden of proof, rather than the burden of production, on the third prong of *Duren* is the proper approach. *See* Russell E. Lovell, II & David S. Walker, *Achieving Fair Cross-Sections on Iowa Juries in the Post-*Plain *World: The* Lilly-Veal-Williams *Trilogy*, 68 Drake L. Rev. 499, 541 (Iowa 2020). Such a burden may not be feasible under the circumstances and thus close the door to an effective remedy.

A lack of remedy drives a stake in the heart of a substantive legal right. *See Baldwin v. City of Estherville*, 915 N.W.2d 259, 284 (Iowa 2018) (Appel, J., dissenting). A proclaimed constitutional right—a fair cross-section in a jury

venire—without a practical remedy to vindicate that right is no right at all. Indeed, that is precisely the problem in our now overturned precedent that required an absolute disparity of 10% when it was impossible for a defendant to make such a showing in any county in Iowa. *See Plain*, 898 N.W.2d at 825. Further, it would be troublesome if the practical difficulties placed on a defendant in proving a fair-cross-section claim, maturing only after the venire has been selected, are so substantial as to require a defendant to surrender his right to a speedy trial in order to develop the fair-cross-section claim.

The unpersuasive exclusion in federal law of run-of-the-mill practices under the Sixth Amendment does not present a barrier to an independent constitutional analysis by this court under article I, section 10 of the Iowa Constitution. But a state constitutional claim under article I, section 10 is not before the court, nor is there any claim that the remedy that has been developed under article I, section 10 of the Iowa Constitution is impractical. I therefore concur with the majority opinion that decides the case solely under the Sixth Amendment.